639 A.2d 1076

Debbie Lynn SIDER

v.

Bruce Harlan SIDER.

GUS BRYAN ECONOMIDES

v.

DEBBIE LYNN SIDER.

No. 101, Sept. Term, 1993.

Court of Appeals of Maryland.

April 18, 1994.

Charles J. Muskin, Glen Burnie, for Debbie Sider.

Mary M. Kramer, Baltimore, for Gus Economides.

Arthur I. Messinger (Carolyn Gilden Krohn, both on brief), Annapolis, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

Our grant of certiorari in this case focuses on two interrelated issues: (1) whether a trial court may deny a petition to establish paternity jointly filed by the mother and the putative biological father of the child, and (2) whether in a divorce proceeding, custody of a minor child may be awarded to the husband, who is not the father of the child when both the mother and the biological father advocate that custody be awarded to the mother.

I

On October 22, 1983, Bruce Harlan Sider (Bruce) and Debbie Lynn Sider (Debbie) were married.[1] Debbie's son from her previous marriage, Sean Dansburger (Sean), resided with Debbie and Bruce in their marital home. The marriage was tumultuous from the very beginning; periods of cohabitation alternated with periods of separation. Even during the

---

1. At the present time, Bruce is a full-time physical education teacher in the Anne Arundel County school system; Debbie is currently retired from the Baltimore County Police Department due to a work related disability.

periods of cohabitation, the couple would go for months at a time without sexual relations.

Sometime in the spring of 1989, Debbie had a three week affair with Gus Economides (Gus).[2] Debbie gave birth to a son, Brock Daniel Owen Sider (Brock), on January 7, 1990. Debbie maintains that she and Bruce had their doubts regarding the paternity of the child; Bruce, however, claims that both he and Debbie believed that he was the father of Brock. Gus was unaware of Debbie's pregnancy and of Brock's subsequent birth.

In September, 1991, Debbie left the marital home for the last time. On October 2, 1991, Bruce filed a Complaint for Final Divorce or Limited Divorce in the Circuit Court for Anne Arundel County.[3] In his complaint, Bruce cited Debbie's then-ongoing adulterous affair with George Brooks (George) as the grounds for divorce.[4] In addition to a prayer for divorce, Bruce also requested in his complaint, *inter alia,* (1) that he be awarded permanent custody of Brock, (2) that he be awarded liberal visitation rights with Sean, (3) that he be awarded child support, (4) that he be granted use and possession of the family home, and (5) that the court make a monetary award to him.

On October 16, 1991, Bruce filed a Motion for Emergency Hearing. The grounds for the motion were that on October 12 Debbie "abandoned and deserted the family home and took with her [Brock]." Bruce further alleged in this motion that Debbie "would not reveal where she was going [ ], nor where she would be residing, nor where [Brock] would be." In a

---

2. Gus is an "officer" with the Maryland State Police.

3. On February 12, 1992, Debbie filed a Counter–Complaint for an Absolute Divorce. The grounds for divorce were that Bruce constructively abandoned or deserted her on or about September 28, 1991. The Circuit Court for Anne Arundel County granted an Absolute Divorce to Bruce on August 27, 1992.

4. Since that time, Debbie has married George. Presently, she is living in Harford County with George, their daughter, and her son, Sean.

somewhat contradictory statement, he also asserted that he "has reason to believe that [Debbie] and [Brock] are presently residing with George Brooks." Bruce, therefore, requested that the court expeditiously grant an emergency hearing to resolve the custody issues relating to Brock. On October 18, 1991, the court granted Bruce's motion and set the emergency hearing for November 1, 1991.

Sometime during this legal maneuvering, George approached Gus and informed him that Debbie suspected that Gus, and not Bruce, was Brock's father. Gus agreed to take a blood test; the results, dated October 25, 1991, indicated a 99.91% probability that Gus was in fact the father of Brock.[5] On October 31, 1991, Debbie and Gus jointly filed in the Circuit Court for Howard County a Petition to Establish Paternity. The court ordered Bruce to show cause, on or before November 30, 1991, why Gus should not be declared to be Brock's biological father.

In the interim, on October 31, 1991, Debbie filed in the Circuit Court for Anne Arundel County, a motion to stay the divorce and custody proceedings pending the outcome of the paternity case in Howard County. Instead, on November 21, 1991, the court (Cawood, J.), in conjunction with the Circuit Court for Howard County (Sybert, J.), stayed the paternity case in that jurisdiction pending the resolution of the divorce and custody case in Anne Arundel County.

At the November 1, 1991 emergency custody hearing, the court, pursuant to a stipulation by the parties, resolved the temporary custody issues. The Pendente Lite Order provided for Debbie to have custody of Brock during the week and for Bruce to have custody on weekends, with the exception of Thanksgiving and Christmas vacations when Brock would be

---

5. In Maryland, evidence of a blood test establishing paternity is admissible in court provided "the statistical probability of the alleged father's paternity is at least 97.3%." Maryland Code (1991 Repl.Vol.) § 5-1029(e)(1)(ii) of the Family Law Article.

with Bruce.[6]

On January 20, 1992, Bruce filed a Petition for Contempt and Other Relief. Bruce alleged that Debbie, in violation of the Pendente Lite Order, denied his judicially scheduled visitation of Brock on several occasions. The resolution of this contempt petition is not disclosed in the record.

On February 12, 1992, Debbie filed, in the Circuit Court for Anne Arundel County, a motion to consolidate the Howard County paternity case and the Anne Arundel County divorce and custody case. The court granted this motion on May 22, 1992.

Earlier, on February 12, 1992, Debbie sought a court order requiring Bruce to submit to a blood test. She averred in her motion that Gus was Brock's biological father. Bruce answered this motion and denied that Gus was the biological father. The court denied Debbie's motion without a hearing.

On March 13, 1992, the court issued another order, which reiterated that Debbie have custody of Brock during the week and that Bruce have custody of Brock on the weekends. On June 8, 1992, Bruce again filed a Petition for Contempt and Other Relief alleging that Debbie was refusing to permit him to see Brock in violation of the court's March 13 Order. After a July 17, 1992 contempt hearing, the court (Lerner, J.) found Debbie in contempt and sentenced her to ninety days in the Anne Arundel County Detention Center, but suspended the sentence contingent on Debbie obeying all court orders.

Debbie filed a second Motion for Blood Test on August 10, 1992. In his answer, Bruce maintained that, in denying Debbie's previous motion for blood test, "Judge James C. Cawood has already ruled a blood test unnecessary as paternity is not in dispute." Debbie eventually withdrew this motion at the beginning of the trial after the court ruled that:

---

6. The order also required both Bruce and Debbie to undergo a psychological evaluation. Bruce complied with this requirement, but Debbie failed to do so, citing financial constraints as her reason.

"there was no question from a biological point of view, based on [Gus's blood] test and I think it was conceded that was [the] reason not to [have Bruce] take [a blood] test, that [Gus] was, in fact, the biological father."

After the consolidated trial in August, 1992, Judge Cawood, in an opinion dated September 11, 1992, with respect to the paternity case, concluded:

"There is little dispute that, at a time when she was having sexual relations with her husband and with Gus Economides, Defendant Debbie Sider became pregnant. She was not sure who the father was. However, she treated the child as that of her husband, Bruce Sider. He had no idea that anyone else was the father.

"When the always stormy relationship between the two began to disintegrate, she became involved with George Brooks, with who[m] she now lives and expects to marry. Together they decided to check out the paternity. Mr. Brooks went to Economides who, as surprised as any one that his three week affair with Mrs. Sider had possibly produced a child, agreed to a blood test which determined that he was in fact the natural father.

"By the time the results of the test were achieved, The Siders had already separated, and armed with this information, Mrs. Sider attacked. On the eve of an emergency hearing, she revealed the blood test to Mr. Sider by way of a Motion to Stay. He refused to abandon his rights to the child.

"*Mr. Sider claims he should be considered the natural parent of the child by estoppel.... We agree with him.*" (emphasis added).

The court further reasoned that:

"It does not take long to get attached to a child, particularly when the child is, or certainly appears to be, one's own. From the evidence in this case, Mr. Sider was deeply concerned with the upbringing of Brock. We need no professional to tell us the trauma of being told, after 21 months of a child's life, that you are not really the parent.

"Mrs. Sider chose a course of action. She had her doubts about the paternity, but she did not disclose them because she knew the devastating effect it would have on the relationship between her and Mr. Sider. Having done this, she cannot wait for the appropriate moment to take advantage of this in a divorce proceeding."

With respect to Gus, the court explained:

"The question remains whether Mr. Economides is estopped. He obviously never knew about the paternity until the revelations by Mr. Brooks. Since that time he has seen the child and given [Debbie] money, but has not told the child he is the father. He seems to be doing the best he can with a difficult situation.

*"Nonetheless, we believe his rights are not paramount to Mr. Sider.* If he had resisted the blood test, we cannot believe a Court would have ordered it. . . .

"We therefore hold that, *at law, Mr. Sider should be considered as the biological father of Brock."* (emphasis added).

With regard to the divorce and custody case, the court said:

"we find [Debbie's] actions toward [Bruce] to be spiteful—not merely the aforementioned paternity problem, but her wilful refusal to grant him the child for weekends on end, and her turning his stepson, Sean, against him.

"We find extreme the hostility both Mrs. Sider and Mr. Brooks have against Mr. Sider."

The court continued:

"In order to improve our understanding of the complex currents behind this case, we ordered the parties to see a psychologist appointed by the Court, Stanley Zweback. Dr. Zweback, seeing only Mr. Sider, found him to be psychologically a proper parent. Mrs. Sider refused to go because it was 'too expensive and difficult.' We find it hard to believe that someone who was to obligate herself for six days of counsel fees for trial found the psychologist too expensive. In any event, she asked the Court for no relief but just

disobeyed the Order, as Judge Lerner subsequently found she flagrantly violated the custody order.

"We have no doubt that Mrs. Sider loves her child, as does Mr. Sider. She has a great advantage in that she is home all day because of injuries which required her to become permanently disabled with the Police Department. It was for that reason that we suggested originally that she have the child during the week, even though we were displeased with her actions about the paternity. However, she has shown that situation will not work."

Therefore, the court concluded:

"In a strict consideration of the best interests of the child, we believe Mr. Sider is the better parent. Assuming we were wrong about the estoppel theory, the question is a much closer one. Is she unfit, or are there exceptional circumstances? (citation omitted). If 'unfit' means will she hurt the child, the answer is no. There is no credible evidence that either has intentionally hurt this child or failed to provide for him. However, we consider all of the factors we have indicated above to be exceptional circumstances.

"We therefore will give primary custody to Mr. Sider."

The court ordered that Bruce be "recognized as the natural father of Brock" and denied the Petition for Paternity filed by Debbie and Gus. It granted custody of Brock to Bruce while reserving reasonable visitation rights to Debbie and granted Bruce the use of the family home and automobile for 18 months. The court also denied Gus's prayer for visitation.

Debbie and Gus appealed to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court first addressed the custody issues. It held that in a custody contest between a third party and a parent, custody in the parent is presumed to be in the best interests of a child and it is only after a showing that the parent is unfit, or upon a finding of exceptional circumstances, that a third party will be awarded custody.

The court reviewed our previous cases which examined custody disputes between parents and third parties and delineated approximately 12 factors which a court should assess in determining whether exceptional circumstances exist. It concluded, however, that only four factors were relevant in the instant case:

(1) The nature and strength of the ties between the child and the third party "custodian";

(2) The intensity and genuineness of the parent's desire to have the child;

(3) The stability and certainty of the child's future in the custody of the parent; and

(4) The character and reputation of the parties.

After reviewing each of these factors under the facts and circumstances of this case, the court agreed with the circuit court and held that "exceptional circumstances existed in this case to rebut the presumption that the minor child's best interest lay with being in the custody of his mother." It therefore affirmed the circuit court's award of custody to Bruce.[7]

The Court of Special Appeals next addressed the paternity case and the following issue raised jointly by Debbie and Gus:

When all of the parties stipulate that the putative father is the biological father of the child and the stipulation is supported by a blood test, does the trial court have the

---

7. With regard to the custody case, the Court of Special Appeals also discussed two other issues raised by Debbie.

First, it addressed her contention that the circuit court erred when it denied her motion to appoint separate counsel for Brock. It said that the failure to appoint counsel for Brock was not reversible error, but noted that, on remand, "the trial court ... may wish to reconsider the propriety of appointing separate counsel to represent Brock."

Second, the court addressed Debbie's argument that the circuit court's denial of her motions for Bruce's blood test was reversible error. The intermediate appellate court responded to this contention by stating that "all parties and courts openly acknowledged Gus's biological paternity, [and thus] paternity was not at issue in the present case (i.e., the divorce/custody case) and, therefore, the trial court did not err by denying Debbie's Motions for Blood Test (of Bruce)."

authority to deny the paternity petition and rule that the husband is the natural father of the minor child?

It first stated that "[t]he short answer to this issue is yes, providing the court determined that it is in the best interest of the child" to deny the paternity petition. The court then concluded, however, that the circuit court failed to discuss what would be in Brock's best interest. Consequently, it held that, with respect to the paternity petition, the case must be remanded to determine the following issue:

"Whether Gus (a male individual who claims to be the father of a child born to a married couple) is entitled to petition the circuit court to determine whether said male individual is the biological father of the child when the child was conceived during the marriage of said married couple?"

The intermediate appellate court thus reversed the circuit court's judgment with respect to the paternity action, and remanded the case to determine whether it was in the "best interest of Brock" to grant the paternity petition. The court set forth the following criteria for determining Brock's best interests, but expressly stated other factors could also apply:

"(1) the stability of the child's current home environment (in light of the aforementioned resolution of the various custody issues discussed above); (2) whether there is an ongoing family unit; (3) the child's physical, mental, and emotional needs; (4) Brock's past relationship with Gus; and (5) Brock's ability to ascertain genetic information for the purpose of medical treatment and genealogical history."

The Court of Special Appeals also noted that if, on remand, the circuit court concludes that it is in the best interests of Brock to grant the paternity petition, the court should then "acknowledge the parties' stipulation that Gus is the natural father of Brock." Finally, the intermediate appellate court explained that if Gus is entitled to petition the court and is acknowledged to be Brock's biological father, the court must consider the issue of Gus's visitation rights. We granted certiorari to consider the significant issues raised in this case.

## II

### (A)

### *The Paternity Action*

Before us, Debbie and Gus assert that a circuit court has no authority to deny a paternity petition when: (1) the mother and biological father of an infant under the age of two jointly request a determination of paternity, (2) the paternity is supported by a blood test and the husband consents to the biological paternity, and (3) there is no marital integrity to protect because of the pending divorce action between the mother and husband. They also maintain that the "best interest of the child" standard, suggested by the Court of Special Appeals as the proper standard on remand, is inappropriate because fundamental interests, parental privacy and paternity, are involved. Moreover, they argue, even if the "best interest of the child" standard is utilized, the uncontroverted facts in this case preclude a court from ruling that Bruce is the "natural" father.

Debbie and Gus next contend that a biological father should not be estopped from establishing his paternity when he filed a petition to do so only six days after learning that he may be the father. They maintain that the denial of the paternity petition violated Gus's rights under both the federal and state constitutions. Specifically, they assert that the disparate treatment of men in general, and of Gus in the instant case, in the context of paternity litigation violates Maryland's Equal Rights Amendment, Article 46 of the Maryland Declaration of Rights.[8]

Furthermore, it is argued that under the Fourteenth Amendment to the United States Constitution, Gus has a fundamental liberty interest in the care, custody, and management of his child. Finally, they aver that the right to conceive

---

8. Article 46 provides:
   "Equality of rights under the law shall not be abridged or denied because of sex."

and to raise one's child is an essential right, which has been ignored in this case.

## (B)

### *The Custody Action*

Debbie and Gus argue that the presumption that a minor child should be in the custody of the child's biological parents was not overcome in this case. They observe that only after a showing that the parents are unfit, or where exceptional circumstances render parental custody detrimental to the child, may a court grant custody to a non-parent. They maintain that the court erroneously found exceptional circumstances in this case. In particular, they claim that no testimony was presented that showed Brock had bonded to Bruce and thus there was no evidence that Brock would suffer any detriment if custody was awarded to Debbie. They also argue that Gus, even though he is the acknowledged biological father, has been treated as a "non-person" throughout this litigation, thus violating his right to due process.

In addition, Debbie and Gus contend that both the trial court and intermediate appellate court based their respective custody determinations solely on the fact that Debbie was hostile to Bruce and contemptuous of the legal system. Consequently, they argue that the custody award was in actuality a punitive award against her for her actions, which is not a proper sanction.[9]

Finally, they maintain that by holding that Bruce "should be considered as the biological father of Brock," and thus recognized as Brock's "natural" father, the trial court in effect granted a judicial adoption, an act prohibited in this State. For these reasons, Debbie and Gus request that custody of Brock be awarded to Debbie.

---

**9.** They assert that the proper relief for her alleged actions would have been to grant a monetary award and an award of attorney's fees.

Bruce maintains that public policy precludes Debbie from attempting to establish that he is not the biological parent in order to further her self-interest in obtaining exclusive custody of Brock. Therefore, he contends that Debbie is estopped from asserting that Bruce is not Brock's biological father because she treated him, and represented him to the world, as the child's father for almost two years. Bruce further argues that Gus should be estopped from asserting any claim to Brock's custody and paternity.

Bruce suggests that under the doctrine of unclean hands, Gus and Debbie's adultery should preclude Debbie from custody of Brock and preclude Gus from establishing his paternity. Therefore, Bruce contends that equity should be applied to prevent Gus, even though he may be the biological parent, from reducing or eliminating the rights of Bruce.

According to Bruce, the circuit court properly used the "best interest" standard in resolving the custody issue. He maintains that the circuit and intermediate appellate courts both correctly and unambiguously concluded that exceptional circumstances existed in this case and thus the presumption that children should remain in the custody of their natural parents was overcome. He points to fourteen factors in the circuit court's opinion which formed the basis for a finding of exceptional circumstances, concluding therefrom that the grant of custody was appropriate.

Moreover, Bruce argues that Debbie is unfit as a parent and thus the court's decision to award custody to him was justified. In addition, he observes that a court's custody determination may not be reversed by an appellate court if the fact finding was not clearly erroneous and the ultimate custody decision was not a clear abuse of discretion.

### III

Although we said in *Monroe v. Monroe*, 329 Md. 758, 767, 621 A.2d 898 (1993), that "establishing paternity is not a necessary factor to be considered when addressing the issue of custody," this case presents a unique situation. Therefore,

unlike the circuit and intermediate appellate courts below, we believe that the paternity issue *in the instant case* must be resolved before we can address the difficult custody issue. In the absence of a paternity determination, we could not in the circumstances of this case properly analyze the custody dispute now before us. First to be determined in this regard is Brock's paternity.

■ In Maryland, a child born to a married woman is presumed to be the offspring of the woman's husband. *See* Maryland Code (1991 Repl.Vol.) § 5–1028(c)(1) of the Family Law Article.[10] *See also Monroe, supra*, 329 Md. at 764–65 n. 2, 621 A.2d 898. This presumption "may be rebutted by the testimony of a person other than the mother or her husband." § 5–1028(c)(2) of the Family Law Article. We have stated, however, "where the party against whom the paternity decree is sought, or as to whom the determination of paternity would be adverse, admits paternity, no further judicial proceedings to establish that fact are required." *Monroe, supra*, 329 Md. at 768, 621 A.2d 898. (citations omitted).

The underlying facts in this case conclusively establish that Gus is Brock's biological father; indeed, Bruce conceded as much in his answer to Debbie's second motion for blood test, and in his trial testimony.[11] Therefore, it appears that no further proceedings with regard to paternity were necessary. The question remains whether the trial court had the authority to deny the paternity petition jointly filed by Debbie, Brock's biological mother, and Gus, Brock's biological father, when there was no marital integrity to protect. In addition, we must consider whether, as occurred here, a court has the power to declare that a third party non-parent is the "natural" father of a child.

---

**10.** This section states:
"There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."

**11.** During the trial, on cross-examination, Bruce was asked "do you now acknowledge [ ] that you are not the biological father of Brock?" and answered "yes."

We agree with Bruce that the "best interest of the child" standard should be used in deciding whether to grant a paternity petition. In *Turner v. Whisted*, 327 Md. 106, 607 A.2d 935 (1992), we concluded that a trial court must consider the best interests of a child before granting a putative father's request for a blood test. *Id.* at 116–17, 607 A.2d 935. Similarly, in this case, the trial court, in deciding whether to grant the jointly filed paternity petition, should have considered what was in the best interests of Brock.

While primarily considering the best interests of the child, the trial court should also have considered the interest that a biological parent, Gus in this case, has in his child. In *Turner, supra,* we explained:

> "although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. 'When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," . . . his interest in personal contact with his child acquires substantial protection under the Due Process Clause.'"

327 Md. at 115–16, 607 A.2d 935 (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 142–43, 109 S.Ct. 2333, 2352, 105 L.Ed.2d 91 (1989) (Brennan, J., dissenting)).[12] On the other hand, "society has historically protected the integrity of the marital

---

12. *See also Michael H., supra,* 491 U.S. at 133, 109 S.Ct. at 2347 (Stevens, J., concurring) ("I therefore would not foreclose the possibility that a constitutionally protected relationship between a natural father and his child might exist in a case like this."); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (the interest of parents in their relationship with their children is a fundamental liberty interest protected by the Fourteenth Amendment); *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972) (a parent has a recognized right to the companionship, care, and custody of his or her minor children which he or she cannot be deprived without due process of law); *In Re Jertrude O.,* 56 Md.App. 83, 98, 466 A.2d 885 (1983), *cert. denied,* 298 Md. 309, 469 A.2d 863 (1984); *Montgomery County v. Sanders,* 38 Md.App. 406, 414, 381 A.2d 1154 (1978). *But Cf. Michael H., supra* (plurality opinion).

family unit from claims of paternity by other men." *Turner, supra,* 327 Md. at 114–15, 607 A.2d 935 (citing *Michael H., supra*).

The trial court should have considered and balanced these competing interests in deciding whether to grant the paternity petition. In *Monroe, supra,* 329 Md. at 772, 621 A.2d 898, we explained the balancing process, in the context of a custody dispute, as follows:

> "Where there is disputed paternity, *i.e.,* two men are competing for custody, *Turner* made clear that the putative father's motive for pursuing the action—[his] 'commitment to the responsibilities of parenthood,' *Turner,* 327 Md. at 117, 607 A.2d 935, and his interest in establishing a relationship with the child—must be balanced against the interest of the presumptive father, and his family, in maintaining an already formed familial relationship. *Id.* The best interest of the child, evidence as to which may come from the child's representative, informs the proper balance."

█ In the instant case, the trial court failed to consider Gus's interests. In fact, the court concluded that: "[Gus's] rights are not paramount to Mr. Sider." We believe the court erred when it dismissed the paternity petition without sincerely considering Gus's interests in the matter.[13]

Had the court properly considered all the competing interests, the only conclusion it could have reached would have been to grant the paternity petition. Looking at the various interests, we conclude that (1) Gus certainly has a significant interest in establishing a relationship with Brock; (2) it does

---

**13.** Bruce argues that the constitutional protection afforded to Gus is not before us because Debbie and Gus failed to raise the issue at the trial level. *See* Md.Rule 8–131(a). Although Bruce is correct that the rule requires a party to raise an issue below to preserve it for appeal, we have occasionally used our discretion under the rule and permitted a party to raise an issue on appeal for the first time. *See Atlantic Mutual v. Kenney,* 323 Md. 116, 122, 591 A.2d 507 (1991); *Crown Oil v. Glen,* 320 Md. 546, 561, 578 A.2d 1184 (1990); *Taub v. State,* 296 Md. 439, 441–42, 463 A.2d 819 (1983). In any event, our decision today does not exclusively rely on the constitutional challenges set forth by Debbie and Gus.

not appear that denying the petition would necessarily be in the best interests of Brock; and (3) perhaps most importantly, unlike many other custody cases including *Michael H., supra*, there is no family integrity to protect. Therefore, the court should have granted the paternity petition and declared that Gus is *the* father of Brock.

Plainly, the court's decision to characterize Bruce as Brock's "natural father" was erroneous. In *Lipiano v. Lipiano*, 89 Md.App. 571, 598 A.2d 854 (1991), *cert. denied*, 325 Md. 620, 602 A.2d 710 (1992), the Court of Special Appeals addressed such an argument. There, the court said:

> "Neither [the definition of natural father in § 5–310] nor the concept of 'Natural father' that it defines have anything to do with custody disputes, however. That section is part of the State adoption law. Section 5–311 generally provides that a child may not be adopted without the consent of his 'natural father' (and 'natural mother') unless their parental rights have previously been terminated. Section 5–310 defines the term 'Natural father' for that purpose."

*Id.* [89 Md.App.] at 578 n. 2, 598 A.2d 854.

▮ A court's attempt to declare a third party to be the "natural parent" of a child in a custody dispute is in effect a judicial adoption, which is not sanctioned in Maryland. *See Board of Education v. Browning*, 333 Md. 281, 286, 635 A.2d 373 (1994) ("In Maryland, the general rule is that there can be no adoption except under and in accordance with a statute.").[14] Furthermore, the circuit court's decision had the effect of terminating Gus's parental relationship with Brock which generally can only be accomplished through a decree of adop-

---

14. Moreover, "Maryland law provides that adoption should not be granted over parental objection unless that course is clearly warranted." *Bridges v. Nicely*, 304 Md. 1, 7, 497 A.2d 142 (1985). *See also* § 5–312 of the Family Law Article (requiring a court to find clear and convincing evidence of a number of factors before granting an adoption to a third party when a parent affirmatively withholds his or her consent).

**530**

tion.[15]

Consequently, a court cannot judicially declare that Bruce is Brock's "natural" father. As stated previously, the court should have granted the joint paternity petition and ruled that Gus was Brock's father. After establishing that Gus is Brock's father and that Bruce is a third party, a court can properly address the custody issue.

## IV

This case involves a custody contest in which the biological mother and father advocate awarding custody to the mother, while a third party, Bruce, seeks custody for himself. Custody disputes between parents and third parties are governed by the principles set forth in *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977); we there said:

> " 'Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary.'[16]

"We have indicated how the presumption may be rebutted. In *Ross v. Pick*, [199 Md. 341, 86 A.2d 463 (1952) ], we pointed out that the ordinary entitlement of parents to the custody of their minor children by the natural law, the common law, and the statute, is not an absolute one and declared that the right 'may be forfeited where it appears

---

**15.** In *Carroll County v. Edelmann*, 320 Md. 150, 176, 577 A.2d 14 (1990), we held that "a circuit court has no authority to terminate a parental relationship other than through a decree of adoption or guardianship." .

**16.** "We set out the rationale of this presumption in *Melton v. Connolly*, 219 Md. 184, 188, 148 A.2d 387 (1959) in these words:

" 'Normally a parent is to be preferred to others in determining custody, largely because the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display.' " (footnote in original).

that any parent is unfit to have custody of a child, or where some exceptional circumstances render such custody detrimental to the best interests of the child.' (citations omitted).

"To recapitulate: the best interest of the child standard is always determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child. Therefore, in parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition."

*Id.* [280 Md.] at 178–79, 372 A.2d 582 (quoting in part *Ross v. Pick, supra,* 199 Md. at 351, 86 A.2d 463).

In the instant case, the trial court's opinion reveals that it primarily treated Bruce as a parent because it concluded that Debbie was estopped from asserting that Bruce was not Brock's father. The court also found in the alternative that, even if Bruce was treated as a third party, exceptional circumstances existed which made custody in Debbie detrimental to the best interests of Brock. The court, however, failed to explicitly state what exceptional circumstances it was relying upon. Because he did not detail his findings with regard to exceptional circumstances, the trial judge must reevaluate his custody decision. The trial judge appears to have concluded that Debbie was not unfit, undoubtedly taking into account that a finding of adultery does not in any way create a presumption of unfitness to have custody of one's own child. *See Davis v. Davis,* 280 Md. 119, 127, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977).

■ On remand, the circuit court should consider the following factors set forth in *Ross v. Hoffman, supra,* and any other relevant factors, in determining whether exceptional circumstances exist:

(1) the length of time the child has been away from the biological parent;

(2) the age of the child when care was assumed by the third party;

(3) the possible emotional effect on the child of a change of custody;

(4) the period of time which elapsed before the parent sought to reclaim the child;

(5) the nature and strength of the ties between the child and the third party custodian;

(6) the intensity and genuineness of the parent's desire to have the child; and

(7) the stability and certainty as to the child's future in the custody of the parent.

We listed other important factors in *Turner, supra:*

"the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs. An important consideration is the child's past relationship with the putative father. (citation omitted). Finally, other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history."

327 Md. at 116–17, 607 A.2d 935. We also stated in *Monroe, supra:*

"Whether the child has established a relationship with a third party sufficient to constitute exceptional circumstances, rebutting the presumption of custody in the biological parent, is not dependent on its development during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing

biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent. That the relationships, one with a known biological parent and the other with an acknowledged, though, in fact, non-biological, parent, progress at the same time, does not render either less viable."

329 Md. at 775–76, 621 A.2d 898. We would further note that it is ordinarily in the best interest of a child to be raised with his or her siblings. *See Hild v. Hild,* 221 Md. 349, 359, 157 A.2d 442 (1960); *Melton v. Connolly, supra,* 219 Md. at 190, 148 A.2d 387; *Hadick v. Hadick,* 90 Md.App. 740, 748, 603 A.2d 915 (1992).

In addition, factors that are specifically relevant to this case include (1) the position of the biological father, Gus; (2) how Brock has fared in Bruce's custody during the past two years; and (3) Debbie's ability to care for Brock during the daytime, *see DeGrange v. Kline,* 254 Md. 240, 243, 254 A.2d 353 (1969).

We reiterate that the appropriate standard in a parent-third party contested custody case, after taking into account the presumption that a child is better off with his or her natural parents, is the best interests of the child. Moreover, we emphasize:

"that in any child custody case, the paramount concern is the best interest of the child. As Judge Orth pointed out for the Court in *Ross v. Hoffman,* [*supra*], we have variously characterized this standard as being 'of transcendent importance' and the 'sole question.' The best interest of the child is therefore not considered as one of many factors, but as the objective to which virtually all other factors speak."

*Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d 964 (1986). *See also Monroe, supra,* 329 Md. at 769, 621 A.2d 898 ("When a court is called upon to resolve the issue of which of the parties to a child custody action should be awarded custody of a child, the critical and overriding consideration is 'what is in the best interest of the child?' ").

Our decision today does not offend the rule that an appellate court should give due deference to a trial court's custody decision. We have explained that the proper standard of review is as follows:

"When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Md.Rule 8–131(c)] applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion."

*Davis v. Davis, supra,* 280 Md. at 125–26, 372 A.2d 231. *See also Domingues v. Johnson,* 323 Md. 486, 491–92, 593 A.2d 1133 (1991).

■ In the instant case, we conclude that the trial court clearly abused its discretion when it denied the paternity petition and resolved the custody dispute without taking into consideration the biological father, Gus.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.*

Concurring opinion by ELDRIDGE, J.

ELDRIDGE, Judge, concurring:

I fully concur in the Court's judgment. Furthermore, I join the Court's opinion except for that portion of Part III which relies on the majority opinion in *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992). I continue to adhere to the views expressed in my concurring and dissenting opinion in *Turner v. Whisted, supra,* 327 Md. at 117–128, 607 A.2d at 941–946,

and my concurring opinion in *Monroe v. Monroe,* 329 Md. 758, 778–783, 621 A.2d 898, 907–910 (1993).