885 A.2d 937

**B.G.**

v.

**M.R.**

**No. 1761, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Nov. 7, 2005.

Michael Wein, Greenbelt, for appellant.

Gary A. Rupard, Temple Hills, for appellee.

Panel MURPHY, C.J., KENNEY, BARBERA, JJ.

BARBERA, J.

B.G., appellant, appeals from a judgment of the Circuit Court for Prince George's County granting custody of his three biological children—Byron, Brittoney, and Brooke—to their maternal grandmother, M.R., appellee. Appellant presents six questions on appeal.[1] We, however, need only consider one: whether the court's finding of "exceptional circumstances" to justify placing appellant's children in the custody of a third party, appellee, can be upheld in light of the Court of Appeals' recent decision, *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005). For the reasons we discuss below, we shall vacate the judgment and remand for further proceedings.

## FACTS AND PROCEEDINGS

Appellant and F.G. (hereinafter "mother") were divorced on September 14, 2000. Under their divorce agreement, appellant and mother had joint custody of their children: Byron, born November 29, 1992; Brittoney, born December 17, 1993; and Brooke, born April 18, 1995 (hereinafter, "the children"). Appellant and mother alternated physical custody of the chil-

---

1. The six questions appellant presents are:
   1. Did the trial court err in finding the existence of an exceptional circumstance under *McDermott v. Dougherty*, based upon appellee's role as "a paid baby sitter"?
   2. Did the trial court err in awarding sole legal custody to appellee, after finding that appellant was not unfit, and failing to find that being in appellant's custody would be detrimental to the children's best interests?
   3. Did the trial court err in not considering the factors discussed in *Shurupoff [v.] Vockroth*, and *Ross v. Hoffman*, which guide trial courts in third party custody cases?
   4. Did the trial court err by over-emphasizing appellant's temporarily decreased contact with the children, while he was in the midst of a custody dispute with the children's mother, preparing the family home for sale and seeking treatment for HIV?
   5. Whether the trial court erred in giving effect to an unenrolled decision for the parties to provide a "consent order" to modify custody?
   6. Whether the trial court erred in weighing appellee's *de facto* custody of children since their mother's death against appellant?

dren each week. Regardless of who had physical custody of the children, appellee, the maternal grandmother, provided day care for the children each day before and after school while their parents were at work, as she had done before the parents' divorce. Appellee received $75.00 per week for her services.

Appellant was diagnosed with human immunodeficiency virus ("HIV").[2] Appellant did not take his medications consistently for quite some time after his diagnosis.[3] As a result, his health deteriorated. He was hospitalized in January 2000 with acute pancreatitis, and again in 2001 with a liver infection. Doctors subsequently changed appellant's diagnosis to acquired immune deficiency syndrome ("AIDS").

---

**2.** The brief of *amicus curiae* in this case, submitted by Lambda Legal Defense and Education Fund, Inc., explains:

> HIV is a retrovirus that infects a type of white blood cell known as the CD4+ lymphocyte. Commonly referred to as "helper T-cells," CD4+ cells play an important role in helping the body fight viral, parasitic and fungal infections. *See Bragdon v. Abbott*, 524 U.S. 624, 634, 118 S.Ct. 2196, 2203, 141 L.Ed.2d 540 (1998) (summarizing natural course of untreated HIV disease). If a person infected with HIV does not receive appropriate treatment, the disease may progress, lowering the level of CD4+ cells in the person's blood. *Id.* If untreated, HIV disease progression leads to immune deficiency, making the infected individual vulnerable to certain opportunistic infections and possibly death. *See* Carlos del Rio & James W. Curran, *Epidemiology and Prevention of Acquired Immunodeficiency Syndrome and Human Immunodeficiency Virus Infection,* in Mandell, Douglas, and Bennett's Principles and Practice of Infectious Diseases 1477, 1484–86 (Gerald L. Mandell et al. eds., Elsevier, Inc. 6th ed.2005) (1979).
>
> "HIV disease" is a term that describes all phases of HIV infection. Acquired Immune Deficiency Syndrome, or AIDS, is a term that refers to significant suppression of the immune system of a person with HIV.... *See* Ctrs. for Disease Control and Prevention, *1993 Revised Classification System for HIV Infection and Expanded Surveillance Case Definition for AIDS Among Adolescents and Adults,* 41 (RR–17) Morbidity & Mortality Wkly. Rep. (1992).

**3.** Although most medical records indicate that appellant was diagnosed in 1998, some medical records indicate that he was diagnosed in 1996 with HIV, and still others suggest that he thought he had the disease since the mid–1980s. There was also testimony that mother knew appellant had HIV in 1997.

Appellant was also hospitalized in August 2003 for eye surgery related to a retinal detachment caused by an infection. Complications from the eye infection caused appellant to become legally blind in his right eye.[4] Appellant has suffered from various other AIDS-related health problems, including, *inter alia,* jaundice, staph infections, problems with his hip, boils, and depression.

Despite his illness, appellant maintained employment with Verizon, where he had worked for 12 years, first as a service technician and then as a project manager until the spring of 2003. After being laid off, appellant collected unemployment, and eventually Social Security disability benefits. In August 2004, he was still looking for work, and planned to pursue a "Return to Work" program through the Social Security Administration.

Sometime in 2003, mother apparently became concerned that appellant could not take care of the children because of his deteriorating health. Appellant stopped seeing the children regularly in August 2003. At a time not clear from the record, mother filed a motion to modify custody.

In early February 2004, the parties appeared in court on the motion. Mother was represented by counsel, and appellant appeared *pro se.* At the hearing, appellant orally agreed to sign a consent order giving mother sole legal custody of the couple's children.

Appellant never signed the consent order. He later testified that, at the time of the hearing, he did not understand the difference between legal and physical custody. When he received the order from mother's counsel, and learned that he would be giving sole legal custody—instead of physical custody—to his former wife, he refused to sign it, and he retained counsel.

---

4. Despite his condition, at the time of trial appellant had a valid driver's license, as he had installed special mirrors in his vehicle to comply with Maryland Motor Vehicle Administration requirements.

On February 10, 2004, mother was murdered by her brother's estranged wife, in the home mother was sharing with her brother. The children, who recently had been residing exclusively with mother, were in the house at the time. Just after mother's murder, Brittoney called appellee. Appellee came to mother's house and accompanied the children to the hospital. Eventually, the sheriff released the children to appellee's custody. On February 12, 2004, appellee filed a complaint for custody and request for an emergency hearing, instituting the action *sub judice.*

Appellant lived at an assisted living facility from January 2004 until April 2004. In April, appellant leased a two-bedroom apartment, where he was living at the time of trial. Appellant secured that apartment so he could have appropriate sleeping arrangements for his children.

The trial on the merits of appellee's complaint was held on August 25, 2004. Appellee testified that she was 72 years old and had been married to her husband for 51 years. Mother was the youngest of appellee's five children, and appellee has 13 grandchildren. Appellee lives with her husband and appellant's children in a four-bedroom house. The house was paid off approximately 10 years ago.

Appellee had one heart attack in 1995, and one in 2003.[5] She has smoked for the last 50 years, and at the time of trial, smoked about half a pack of cigarettes per day. Appellee's husband smokes as well, although no one smokes in their house.

Appellant testified that in the past, his CD4 cell count had "been all the way down to 1," and his viral load had "been so high that they couldn't read it." [6] According to appellant's

---

**5.** Although appellee initially indicated that neither attack required an operation, she then testified that she "had angioplasty." Appellee began taking various medications after each heart attack, although it was unclear if she still was taking those medications at the time of trial.

**6.** *Amicus curiae* explains: "In combination, CD4+ and viral load measurements are considered a good predictor of disease progression;

medical records, as of February 5, 2004, his CD4 cell count was 9 cells/mm$^3$ and his viral load was 2457 copies/mL. As of August 4, 2004, appellant's CD4 cell count was 186 cells/mm$^3$ and his viral load was 156 copies/mL. Based on appellant's low viral load and increased cell count, his condition appeared to be improving by the time of trial.

At the conclusion of the evidence and after hearing counsel's arguments, the court adjourned for the day. The next morning, the court delivered its findings and custody ruling. The court first found that appellant was "not unfit":

> After carefully listening to the testimony of the parties and their witnesses, and most importantly, after a thorough review of the medical records, the Court does not believe that as of this trial date, [appellant] is unfit because of his health. After he left the assisted living facility in April 2004, he has been taking his medications regularly, and the Court has accepted and gives great weight to ... a notarized affidavit from Dr. [C.G.], and that is dated August 25th, 2004, stating, among other things, that it is her opinion that [appellant]'s HIV infection should not at this time have any medical effect on his ability to take care of his children.

> She goes on to say I am not able to make any determination about other factors that may impact on [appellant]'s ability over time to provide for the care and support of his children....

> Just as importantly, I have also reviewed all the medical records that have been submitted into evidence in this case. And my conclusions are that only when [appellant] does not take his medication does he reach a stage where he cannot properly care for his children. He has been hospitalized

---

a low viral load and high CD4+ count generally indicates that the individual has a strong immune system and is not likely to experience progression of HIV disease." (Citing Carlos del Rio & James W. Curran, *Epidemiology and Prevention of Acquired Immunodeficiency Syndrome and Human Immunodeficiency Virus Infection*, in Mandell, Douglas, and Bennett's Principles and Practice of Infectious Diseases 1477, 1485 (Gerald L. Mandell et al. eds., Elsevier, Inc., 6th ed.2005) (1979)).

approximately three times since 2000. And it has only been, and those hospitalizations were only for a couple of days. He currently appears to be being treated regularly at the [ ] Hospital, and he is being monitored closely. The Court can only conclude from the evidence that has been presented during this trial that he is not unfit to care for his children.

The court found, however, that there were exceptional circumstances sufficient to rebut the presumption that the children's best interests were best served in appellant's custody. The court explained that finding as follows:

[L]istening carefully to the testimony, reviewing the evidence, the Court concludes that this case, indeed, has exceptional circumstances.

[Appellee] has been more than the normal grandmother to Byron, Brittany [sic], and Brooke. She has served as the surrogate mother to these three children since their birth. She has provided both preschool care and after school care to all three children. In fact, despite the fact that the natural mother was at one time living in Charles County, and [appellant] was living in Lanham, the children attended school [near appellee's home], and have always attended these schools since they started school. And those schools are in close proximity to [appellee's husband]'s house. And these children have never attended any other school.

Because this Court concludes that [appellee] has been there for these children since birth, not only as a grandmother, but as a surrogate parent, it is clear to this member of the bench that this is, in fact, unusual circumstances. It is also unusual circumstances that their mother ... was murdered six days after the hearing before Judge [Sherrie] Krauser, and which the grandmother was able and ready to step right in and raise these three children in her home.

In other words, given the trauma that these three children observed and had to live through, they were able to move right into their grandmother's home and not have to adjust to a home that they were not comfortable with.

Therefore, the Court believes that [appellee] has successfully overcome the presumption that a natural parent has over someone considered a third party.

The Court then found that it was in the best interest of the children to award custody of them to appellee. We set forth here most of that extensive ruling:

And I have gone through the custody factors one by one. And I will now review them.

The first factor is the fitness of the parents. Now, when we say parents in here, I am including [appellee] and [her husband]. [Appellee] is 72 years old, and [her husband] is 75 years old. They have been married for 51 years, and have had five children and thirteen grandchildren. The [bi-level] home that they have lived in for 37 years has been paid off[,] . . . and appears to be adequate for the purposes of the three children. . . .

Both [the husband] and [appellee] are retired, and thus able to provide full time [ ] attention to the children. [He] receives a retirement pension from the Post Office, and they both collect Social Security.

In an in camera interview with the children, all three of them expressed great love and devotion to both their grandmother and their grandfather. . . .

It was brought out in testimony that [appellee] has suffered two heart attacks, but she appears to me to certainly have all of her facilities. And she appears to have recovered satisfactorily, or at least she believes that she has. . . . [Appellant] is also a fit person to raise his children. In my discussions with the children, they all expressed great love for him, but were worried about his illness. . . . They stated that he takes his medications all the time, and I am quoting the children, "because he wants to take care of us." I can't think of a better reason to take your medications.

The children did not express any negative thoughts or issues at all about their father. We discussed his driving, and the children inform me he has special mirrors on his car because of his eyesight. They like going to the park with

him, they like watching TV with him, movies and sometimes with Byron . . . they play golf.

The next factor I am going to discuss is the character and reputation of the parties. The Court was extremely impressed that none of the children expressed any alienation at all from either the father or the grandmother or grandfather. It is clear that both parties have tried hard and have not tried to influence these children as to what they should say or what they want them to say.

\*　　\*　　\*.

The next factor I have to look at is the desire of the natural parents and any agreement between them. The natural father, [appellant], did, on February the 4th, 2004 consent to giving sole legal custody and primary physical custody to his former wife, [mother].[7] During the marriage to [mother], the natural father, [appellant], apparently did not object to the grandmother caring for the children before and after school, even after the parties were divorced.

\*　　\*　　\*

The next factor is the potential for maintaining natural family relations. The strength of both [appellee] and [appellant] is they both have very strong family support. [Appellant] has brothers and sisters who have helped look after him and visit him regularly. Byron, Brittany [sic], and Brooke enjoy the relationships with their cousins on [appellant]'s side, and there is frequent visitation.

[Appellee] has five married children and thirteen grandchildren, and they are all frequent guests in her home. The children, again, express great love and affection for their cousins, and they very obviously have strong ties to their aunts and uncles. [Appellee] stated in her testimony that if

---

7. This finding is called into question by appellant's uncontradicted testimony that he did not sign the consent order prepared after the hearing.

she gets custody, [appellant] can have visitation whenever he wants.

The Court concludes that both parties would encourage continuing these relationships with the extended family. But given the circumstances of [appellant], the Court believes that [appellee] would be more likely to encourage these continuing relationships than would [appellant].

The other factor the Court considers is what is known as preference of the children.... [A]ll three children expressed great love and affection for their father and for their grandparents. When asked their preference, Byron stated he hadn't really thought about it. And the two girls basically stated that they liked their present arrangements as they are living with their grandparents.

The Court believes that given the trauma that these children underwent regarding the murder of their mother, the Court believes that the one thing that these children need most in their life is stability. They have basically lived with the grandparents since birth, and undisputedly since their mother's death. To change their primary residence at this stage, the Court believes would be unsettling to say the least.

\*     \*     \*

Now, I am going to discuss the maternal [sic] opportunities affecting the future life of the children. As a result of their mother's demise, the three children are receiving SSI benefits in the approximate amount of $3000. [Appellant] also receives SSI benefits as a result of his disability from AIDS. [Appellant] is presently unemployed and is looking for a position. [Appellant] does not pay child support, but none is being requested and does not appear to be needed, given the children's SSI benefits.

Because Byron needs help in his reading skills, [appellee] has enrolled him for the past summer into the Sylvan Learning Center....

\*     \*     \*

The next factor I will discuss is the age, health in general of the children. Byron [ ] is 11 years old, Brittany [sic] is 10 years old, and Brooke is 9 years old. All appear to be physically healthy. . . .

Their emotional difficulties involving the traumatic demise of their mother is being handled by a therapist on a weekly basis. . . . The children appear to be mostly healthy, despite this event, and are apparently doing well in school. . . .

\* \* \*

I next reviewed the factor of the residence of the parents and the opportunity for visitation. The grandparents have lived in their house for 37 years. It is a home that these children are comfortable with since their infancy. It appears to be adequate for their needs, even when additional grandchildren visit or spend the night. . . .

[Appellant] has been living in an apartment since April 1st, 2004, and it has two bedrooms. The children immensely enjoy the visits with their father, and they do these visits every other weekend. . . .

The next factor is the length of separation between the parents. Essentially, the three children have never had a separation from their grandparents. . . . On the other hand, [appellant] shared custody with [mother] on alternating weeks[,][and] . . . [appellant] acknowledged that from October 2003 through December 2003, he [had] very little contact with the children because of his illness.

. . . He has also had little to no contact with the children when he was in the assisted living facility from January to March.

The next factor was whether there was a previous voluntary abandonment or surrender of custody of the children, and I think that has already been previously discussed.

Weighing these factors, the Court finds that both [appellee's husband] and [appellee] are fit and proper persons to have custody of the three children. However, due to unusual circumstances, and weighing the factors, the Court concludes that it is in the best interest of these children to

remain with [appellee] in order to provide the children the [ ] stability that they need. And I will grant [appellee] sole legal custody with reasonable and liberal rights of visitation to [appellant].

The court's order was reduced to a written judgment and docketed on September 14, 2004. Appellant noted this timely appeal.

## DISCUSSION

In the months since the circuit court rendered its judgment in this case, two appellate decisions have issued that bear directly on this appeal: *McDermott*, 385 Md. 320, 869 A.2d 751, and *Karen P. v. Christopher J. B.*, 163 Md.App. 250, 878 A.2d 646 (2005). Both involve, as does this case, review of a trial court's decision to award custody to a private third party. These cases, and the case law discussed in them, provide the proper framework for our decision in the instant case. *See Bittner v. Huth*, 162 Md.App. 745, 760 n. 11, 876 A.2d 157 (2005) (noting that the appellate court decides the appeal by resort to the law in effect at the time of its decision), *cert. denied*, 389 Md. 125, 883 A.2d 915 (2005).

We begin with the threshold proposition that, "[i]n the area of child custody, the law recognizes a rebuttable presumption that the child's best interests will best be served by custody in a biological parent, over a third party; and a third party bears the burden of showing the contrary." *Karen P.*, 163 Md.App. at 265, 878 A.2d 646. We explained in *Karen P.* that the presumption in favor of custody in the biological parent "arises from the judicially accepted belief that 'the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to a desire and efforts to care properly for and raise the child, which are greater than another would be likely to display.' " *Id.* (quoting *Melton v. Connolly*, 219 Md. 184, 188, 148 A.2d 387 (1959)).

■ This presumption "can be rebutted by a finding either of lack of fitness on [the parents'] part or the existence of 'extraordinary circumstances ... which are significantly detrimental to the child remaining in the custody of the [biological] parent or parents.'" *Karen P., supra,* 163 Md.App. at 265, 878 A.2d 646 (quoting *McDermott,* 385 Md. at 325, 869 A.2d 751); *see also Sider v. Sider,* 334 Md. 512, 531, 639 A.2d 1076 (1994); *Ross v. Hoffman,* 280 Md. 172, 178–79, 372 A.2d 582 (1977).

We recognized in *Karen P.* that

[t]he circumstances that will rebut the presumption that a child's best interests are served by being in the custody of his biological parent, as opposed to in the custody of a private third party, must be "extraordinary, exceptional, or compelling ... [such as] that require the court to remove the child from the natural parent[ ] in order to protect the child from harm."

163 Md.App. at 266, 878 A.2d 646 (quoting *McDermott,* 385 Md. at 357, 869 A.2d 751).

■■ If the court does not find either unfitness or exceptional circumstances, the "presumption remains, and custody must be awarded to the biological parents (or parent). If the court makes either such finding (parental unfitness or exceptional circumstances), the presumption is rebutted and the court then must resolve the custody dispute by applying the best interest of the child standard." *Karen P.,* 163 Md.App. at 265, 878 A.2d 646.

■ The *McDermott* Court stated that "[t]he need to find 'exceptional circumstances' is derived from the belief that extreme care must be exercised in determining a custody placement other than with a fit parent." 385 Md. at 419, 869 A.2d 751. The *McDermott* Court quoted from *Hoffman* a number of factors that courts should consider in determining whether parental custody will be detrimental to the child. Those factors

"include the [1] length of time the child has been away from the biological parent, [2] the age of the child when care was assumed by the third party, [3] the possible emotional effect

on the child of a change of custody, [4] the period of time which elapsed before the parent sought to reclaim the child, [5] the nature and strength of the ties between the child and the third party custodian, [6] the intensity and genuineness of the parent's desire to have the child, [and] [7] the stability and certainty as to the child's future in the custody of the parent."

*McDermott,* 385 Md. at 419, 869 A.2d 751 (quoting *Hoffman,* 280 Md. at 191, 372 A.2d 582).

■ Other factors may be considered. They include "the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs." *Sider,* 334 Md. at 532, 639 A.2d 1076 (citations and internal quotations omitted).

■ A third party does not necessarily overcome the presumption of parental custody by playing an active role in a child's life or by caring for the child for a period of time. The *McDermott* Court made this clear:

"Our cases have emphasized that parents should be encouraged in time of need to look for help in caring for their children *without risking loss of custody.* The presumption preferring parental custody is not overcome by a mere showing that such assistance was obtained. Nor is it overcome by showing that those who provided the assistance love the children and would provide them with a good home. These circumstances are not alone sufficient to overcome the preference for parental custody."

385 Md. at 431, 869 A.2d 751 (quoting with approval *In re Guardianship of Sams,* 256 N.W.2d 570, 573 (Iowa 1977)).

The *McDermott* Court applied the foregoing principles to reverse the award of custody of the child to a third party, his grandmother, in a dispute between the grandmother and the child's biological father. *Id.* at 323–24, 326, 869 A.2d 751. The Court determined that it was error for the trial court to find that the demands of McDermott's career as a merchant marine, which required him to leave the state for months at a time, constituted an exceptional circumstance sufficient to

overcome the presumption that his child's best interests were served in his custody. *Id.* at 422, 869 A.2d 751. The Court held that, "under circumstances in which there is no finding of parental unfitness, the requirements of a parent's employment ... do not constitute 'extraordinary or exceptional circumstances' to support the awarding of custody to a third party." *Id.* at 325–26, 869 A.2d 751.

The *McDermott* Court rested its holding, in part, "upon the potential for absurd results," if a court were to deprive a fit parent of custody of his or her children "based upon the fact that the child, in a particular case, might be 'better raised' by grandparents." *Id.* at 326, 869 A.2d 751. The *McDermott* Court "explicitly ... adopted the majority view" that, in third-party custody cases,

> the "best interest" standard is inappropriate unless the finder of fact *first* finds that the natural parents are unfit, the natural parents by their conduct have waived or lost their "constitutional protections," or there is a finding of extraordinary, exceptional, or compelling circumstances that require the court to remove the child from the natural parents in order to protect the child from harm. It is only if the parents are unfit, or if there is some exceptional circumstance exposing the child to harm, that the child may be removed from the custody of the parents. If a preliminary finding of parental unfitness or extraordinary circumstances is made, the court is then faced with what to do with the child. In only that context, then, after such preliminary findings are proved, may the custody of the child be based on a "best interest" standard.

Id. at 357, 869 A.2d 751; *see also id.* at 374–75, 418–19, 869 A.2d 751.

Against this backdrop we consider the case before us. Our review of the court's decision is governed by Maryland Rule 8–131(c). *See Karen P.,* 163 Md.App. at 264, 878 A.2d 646. "We review the case on both the law and the evidence: we will not set aside the judgment of the trial court unless it is clearly

erroneous, and we give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.*

Appellant disputes the court's finding of exceptional circumstances. He argues, *inter alia,* that the court's ruling does not square with the exceptional circumstances test announced in *McDermott.* He also argues that the court committed legal error by failing to take into account the factors, set out in *Hoffman,* that are relevant to the determination *vel non* of the existence of exceptional circumstances in this case. Appellee, of course, disagrees, and urges us to uphold the court's finding of exceptional circumstances.

The trial court based its finding of exceptional circumstances on essentially three first-level findings: (1) the children have always attended the schools near appellant's home; (2) the children's mother was murdered; and (3) "[appellee] was able and ready to step right in and raise these three children in her home," so they did "not have to adjust to a home that they were not comfortable with."

These first-level findings are not clearly erroneous.[8] Nonetheless, the court's ultimate finding of exceptional circumstances to overcome the presumption that custody of the children should remain with appellant must be vacated and reconsidered in light of *McDermott,* for several reasons.

---

**8.** Certain other findings, however, appear to be clearly erroneous. The court found that the children had "basically lived with" appellee since birth. The record certainly reflects that appellee has consistently been a vital presence in the children's lives, yet there was no evidence that the children lived with appellee before the six-month period between mother's murder and the custody hearing. Moreover, appellant apparently agreed to allow the children to live with appellee during those months so that they could complete the school year at their current school. Furthermore, appellee testified that, after the parents' divorce, the children did not stay overnight at appellee's house on appellant's weeks with the children; and they stayed with appellee only occasionally during mother's weeks. Even accounting for the fact that appellant did not maintain the bi-weekly visitation schedule for periods when he was ill in 2001 and 2003, the trial court's characterization of appellee as the children's "surrogate mother" seems unfounded.

█ First, because the court did not have the benefit of *McDermott* when deciding this case, it did not consider, and so did not find, that appellant's retaining custody of the children would be significantly detrimental to them. The *McDermott* Court made clear, however, that "exceptional circumstances" are circumstances that make custody in the parent *significantly detrimental* to the child. *See* 385 Md. at 325, 869 A.2d 751. The central focus of the analysis, therefore, is whether the child would suffer significant harm if the biological parent retains custody. *See id.,* 385 Md. at 357, 869 A.2d 751.

The court did not find that placing the children in appellant's custody would be harmful or significantly detrimental to their well-being. Even in making its findings and decision on the award of custody, the court did not find—or imply—that the children's being in appellant's custody would be significantly detrimental to them. To the contrary, the court expressly found that appellant was "a fit person to raise his children."

Second, it appears that the court did not consider the relevant *Hoffman* factors, which factors the *McDermott* Court restated, with apparent approval. *See id.* at 419, 869 A.2d 751. Specifically, the court apparently did not consider, in the context of its finding of exceptional circumstances, that appellant had been a regular part of the children's lives since their birth; the extent to which appellant demonstrated an intense and genuine desire to have custody of the children; or the stability or certainty of the children's future while in his custody. All of these factors are among those identified in *Hoffman* and are relevant to this case.

█ Third, the court's ruling on exceptional circumstances seems to be driven, at least to some extent, by the court's belief that the children's best interests would be served by having them remain in appellee's household. The court pointed out that the children's schools were in the vicinity of appellee's house and that they had been residing at appellee's home since their mother's death six months before the hearing. Not unlike the trial court in *McDermott,* 385 Md. at 422–

23, 869 A.2d 751, the court seemed to equate the emotional stability and logistical practicalities of the children's current living situation with the existence of exceptional circumstances. Even if the law was unclear before, it is now clear, in light of *McDermott,* that the children's best interests do not figure into the exceptional circumstances analysis.

We conclude that the court relied upon reasoning that is flawed, in light of *McDermott,* when it found that exceptional circumstances existed to overcome the presumption that appellant should have custody of the children. Because appellant was not unfit and the court's finding of exceptional circumstances cannot be sustained for the reasons we have discussed, we also cannot sustain the court's determination that it was in the best interests of the children to have custody awarded to appellee, as a third party.[9] *See McDermott,* 385 Md. at 325–26, 869 A.2d 751.

We shall vacate the judgment and remand this case to permit the court to reconsider, in light of *McDermott,* whether appellee has satisfied her burden of establishing exceptional circumstances. The court should consider the relevant *Hoffman* factors "and any other relevant factors, in determining whether exceptional circumstances exist." *See Sider,* 334 Md. at 532, 639 A.2d 1076. The court may conduct such further proceedings as it deems necessary to a proper determination of this issue and, if necessary, the ultimate issue of custody. The facts as found by the court at the previous hearing govern the court's determination of appellant's fitness and the existence *vel non* of exceptional circumstances,[10] unless circumstances have changed in the months since that hearing that make additional fact finding on those issues necessary. If, by application of the *McDermott* analysis, the court finds either that appellant is unfit or that there exist exceptional circumstances that would justify removal of the children from the

---

9. For this reason, we do not discuss the court's "best interests" analysis, and do not reach the question of whether the court exercised proper discretion in awarding custody of the children to appellee.

10. *But see supra* note 8.

custody of their biological parent to protect them from harm, then, but only then, should the court assess (based on the facts previously found and any newly developed facts) whether it is in the best interest of the children that (1) appellant retain custody; (2) appellee be given custody; or (3) the parties have joint custody.[11]

**JUDGMENT VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; CHILD CUSTODY ORDER TO REMAIN IN FORCE AND EFFECT AS A *PENDENTE LITE* ORDER PENDING FURTHER ORDER OF THE CIRCUIT COURT.**

**COSTS TO BE PAID BY APPELLEE.**

---

11.   Our disposition renders moot appellant's "Motion to Remand Case."