598 A.2d 854

Jim LIPIANO

v.

Sharron Marie LIPIANO, et al.

No. 146, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Dec. 5, 1991.

Allen J. Kruger (Kruger, Kovelant & Hollmann, on the brief), Laurel, for appellant.

George E. Meng, Lower Marlboro, for appellees.

Argued before WILNER, C.J., and MOYLAN and BLOOM, JJ.

WILNER, Chief Judge.

This is another of those unfortunate custody cases in which, whoever else wins, the child generally loses.

Sharron and Jim Lipiano were married on August 11, 1973, and, except for a week-long separation, lived together until February 19, 1988. In 1982, Ms. Lipiano, unhappy in the marriage, commenced an adulterous relationship with Dr. Joseph Liss, which resulted in her becoming pregnant in February, 1984. The child, Victoria, was born on November

29, 1984, and it is now clear and accepted that Dr. Liss is her biological father.

There is some question as to when Mr. Lipiano was first informed that he may not be Victoria's biological father. He acknowledges that his wife disclosed her affair with Dr. Liss during her pregnancy but disputes her claim that she disclosed as well that Dr. Liss was the cause of the pregnancy.[1] In any event, after a one-week separation following that disclosure, Mr. and Ms. Lipiano agreed to continue their marriage for the sake of the child. Mr. Lipiano said that a condition of the reconciliation, to which Ms. Lipiano agreed, was that she would remain "faithful to me." Mr. Lipiano was named as Victoria's father on her birth certificate, and he and Ms. Lipiano raised the child. Ms. Lipiano stayed home for about three months; when she returned to work, Mr. Lipiano and his parents provided about half of Victoria's care. Although there was evidence that Ms. Lipiano told Dr. Liss during her pregnancy that he was the father of the as-yet unborn child, the paramour had no direct involvement with Victoria until February, 1988. He made no paternity claim, did not visit with her, and contributed nothing to her support.

Despite their efforts, the marriage between the Lipianos continued to deteriorate, and at some point, though continuing to live with her husband, she resumed her affair with Dr. Liss. In 1987, she and Dr. Liss consulted an attorney to determine whether they might gain custody of Victoria, but they were told that, because the Lipianos were married at the time of Victoria's conception and birth, "there wasn't a snowball's chance in hell of [Dr. Liss] getting custody." On

---

1. Ms. Lipiano claimed that she knew that Dr. Liss had been the cause of her pregnancy because he was the only person with whom she was then having sexual intercourse and that she told Mr. Lipiano that Dr. Liss was the father of the yet-unborn child. Mr. Lipiano asserted that he was having sexual relations with his wife as late as March, 1984, that in April or May of that year, Ms. Lipiano acknowledged her affair with Dr. Liss, but that, when asked whether Liss was the father, she replied, "I really don't know."

February 19, 1988, Ms. Lipiano and Dr. Liss, without notice to Mr. Lipiano, took Victoria and moved to Boston, where Dr. Liss found work in a medical clinic. After six months, however, in order to make it more difficult for Mr. Lipiano to discover their whereabouts, they moved to Burlington, Vermont, where Ms. Lipiano assumed an alias and Dr. Liss interrupted his medical career and took a job as a janitor.

Although Mr. Lipiano received several short letters from his wife during this period, they did not reveal her location. In March, 1988, two weeks after Ms. Lipiano's flight, Mr. Lipiano filed a complaint in the Circuit Court for Charles County for divorce and other relief, including custody of Victoria. In May, the court entered an order directing Ms. Lipiano to return Victoria to Maryland and restraining her from removing the child from this State. It was not until September, however, that, with the aid of a private investigator, Mr. Lipiano was able to locate his wife and Victoria in Vermont, serve the order, and cause the child to be returned to his care.

Ms. Lipiano and Dr. Liss also returned to Maryland. In October, 1988, she filed an answer and a counterclaim in the divorce action in which she (1) asserted that Mr. Lipiano was not Victoria's father and (2) sought custody of Victoria for herself. Several days later, she filed a separate action, in the same court, to establish paternity of Victoria. In that action, she not only claimed that it was "impossible" for Mr. Lipiano to be Victoria's father but asserted publicly that Dr. Liss was the father. Mr. Lipiano responded, in part, with an action for declaratory judgment seeking an order from the court declaring him to be "the natural father of Victoria under the equitable parent doctrine." Dr. Liss, not to be left out as a plaintiff, filed his own action to "legitimate" the child. Through a consent order, Mr. Lipiano retained custody of Victoria subject to specified visitation with Ms. Lipiano while the litigation was pending.

Dr. Liss's action was dismissed in December, 1988, without prejudice to his ability to have his paternity established in the pending paternity action filed by Ms. Lipiano, and

indeed he then filed a request for custody in that action. Blood tests taken in the paternity case revealed that Mr. Lipiano was absolutely not Victoria's father and that there was a 99.81% probability that Dr. Liss *was* her father. The two cases were thereafter consolidated. Hearings were conducted for nine days spread over five months. Finally, in an opinion filed on June 22, 1990, followed four days later by an order, the court found that, because Dr. Liss was the biological father of Victoria, there was a presumption that her best interest lay in his having custody rather than Mr. Lipiano, that to overcome that presumption, Mr. Lipiano had to establish either that Dr. Liss was an unfit parent or that there were "exceptional circumstances" making such custody detrimental to Victoria, and that he had failed to establish either of those requirements. Accordingly, the court found that "the best interest of the child dictates that custody be awarded to her natural parents," and so it granted custody to Ms. Lipiano and Dr. Liss, subject to specified visitation with Mr. Lipiano.

In this appeal, Mr. Lipiano asserts (1) that he should not be deemed an inferior candidate for custody *vis a vis* Dr. Liss because he is Victoria's "natural" father and her "equitable" father, even if he is not her biological father, and (2) that Victoria's best interest lies in his having custody as opposed to Dr. Liss.

Before addressing these arguments, we desire to clarify three things. First, the contest here is not solely between Mr. Lipiano and Dr. Liss. The court awarded custody of Victoria to Ms. Lipiano and Dr. Liss who, the record reveals, are living together, have a home in which they are able to raise Victoria, and plan to marry as soon as the Lipianos are divorced. Joint custody between Mr. and Ms. Lipiano was never sought by either of them and would, in any event, be clearly contraindicated under the principles laid down in *Taylor v. Taylor*, 306 Md. 290, 508 A.2d 964 (1986), given the generally rancorous relationship between the parties. The contest, then, is between Mr. Lipiano, on the one hand, and Ms. Lipiano and Dr. Liss, on the other.

This is significant in terms of the issue raised by Mr. Lipiano, as Ms. Lipiano, at least, is not only Victoria's biological mother but has always been her nurturing one as well. The polarization of statuses, then, is not complete here.

■ Second, although in his brief, Mr. Lipiano urged that the standard of review to be applied by us is that set forth in *Sullivan v. Auslaender*, 12 Md.App. 1, 276 A.2d 698 (1971), *i.e.*, that we are not bound by the "clearly erroneous" rule but may exercise our best judgment in determining whether the lower court's decision was best for the child, he conceded at oral argument that the *Sullivan* standard no longer applies. That standard was specifically disapproved in *Davis v. Davis*, 280 Md. 119, 372 A.2d 231, *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977). Instead:

> "When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Md. Rule 8–131(c) ] applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion."

*Id.* 280 Md. at 125–26, 372 A.2d 231.

Finally, it is important to note that Mr. Lipiano makes no complaint in this appeal about the procedure leading to the Circuit Court's conclusion that Dr. Liss is Victoria's biological father, including the taking of and reliance on blood tests; he appears to concede that Dr. Liss is indeed her biological father. *Compare, Monroe v. Monroe*, 88 Md. App. 132, 594 A.2d 577 (1991).

In this setting, we turn to the issues raised by Mr. Lipiano.

The principles governing the judicial resolution of child custody disputes between biological parents and other persons were set forth in *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977), filed less than two weeks after *Davis v. Davis, supra.* Summarizing its several conclusions, the Court there held, at 178–79:

> "To recapitulate: the best interest of the child standard is always determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child. Therefore, in parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition."

The language used by the *Ross* Court is clear and precise. It does not envisage there being degrees of third parties—"natural" parents who are not biological parents, "equitable" parents, and others. Certainly, the closeness of the relationship between the child and the non-biological parent is of considerable importance, but that importance relates to whether there are exceptional circumstances which would make an award of custody to the biological parent detrimental to the best interest of the child. It does not, under the *Ross* standards, elevate the third party to initial parity with the biological parent. We need not, therefore, reject the concepts of "natural" or equitable parenthood posited by Mr. Lipiano; they may possibly be relevant in some other context.[2] But so long as the Court

---

2. In asserting his status as Victoria's "natural" parent, Mr. Lipiano relies on the definition of "Natural father" in Md.Ann.Code Fam.Law

of Appeals adheres to the conclusions (and the articulation of those conclusions) set forth in *Ross v. Hoffman,* a person in Mr. Lipiano's position stands as a third party with respect to the child and thus must, to the trial court's satisfaction, overcome the presumption created by the Court of Appeals.

 It is clear that the trial judge applied the correct principles of law. He quoted directly from *Ross v. Hoffman* and then proceeded to make findings of fact and judgmental conclusions based on the standards set forth in that case. He concluded that all three candidates were fit and proper, and there was evidence before him to justify that conclusion, which is therefore not clearly erroneous. He also found no exceptional circumstances sufficient to overcome the presumption favoring Ms. Lipiano and Dr. Liss over Mr. Lipiano, and, though we can readily understand the profound loss and hurt that Mr. Lipiano must feel, on this record we cannot say that this second finding was clearly erroneous, to the extent it entailed factual determinations, or represented an abuse of discretion, to the extent it was judgmental.

No one, we expect, will condone Ms. Lipiano's conduct in having the extramarital affair that led to her pregnancy or in the way she abruptly left with Victoria and secreted the child from the only father she then knew. That is something she will have to work out with her own conscience and with Victoria. But that conduct, under the prevailing Maryland law, does not necessarily make her an unfit person to have custody of the child. Nor does Dr. Liss's participation in it, or, given the legal advice he obtained in 1987, his failure to put forth his claim more expeditiously make him unfit as a matter of law. The fact is that Victoria is with

---

art., § 5–310. Neither that definition nor the concept of "Natural father" that it defines have anything to do with custody disputes, however. That section is part of the State adoption law. Section 5–311 generally provides that a child may not be adopted without the consent of his "natural father" (and "natural mother") unless their parental rights have previously been terminated. Section 5–310 defines the term "Natural father" for that purpose.

her natural parents, in the commonly accepted notion of that term—parents whom the record indicates care very much for her and are able to provide her a stable and nurturing environment—and yet she retains the prospect of a loving relationship with Mr. Lipiano as well. This was no doubt an agonizing decision for the trial judge. Other judges may have decided the case differently. But we can find no basis to upset that decision. In the exercise of our discretion, however, we shall split the costs of the appeal equally, one-half to be paid by appellant and one-half by appellees.

JUDGMENT AFFIRMED; COSTS TO BE PAID ONE-HALF BY APPELLANT, ONE-HALF BY APPELLEES.