878 A.2d 646

**KAREN P.**

v.

**CHRISTOPHER J.B.**

No. 2116, Sept. Term, 2004.

Court of Special Appeals of Maryland.

July 11, 2005.

252

Monica L. Scherer (Silverman, Thompson & White, LLC, on the brief), Baltimore, for appellant.

Jan O'Connor, Columbia, for appellee.

Panel: DEBORAH S. EYLER, MEREDITH and
RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

After a two-day trial, the Circuit Court for Baltimore County granted custody of Sebastian B. and Claudia B. to Christopher J. B., the appellee. Karen P., the appellant, is the children's mother. Christopher is the biological father of Sebastian, but not of Claudia.[1]

On appeal, Karen challenges the decision with respect to Claudia only, posing one question:

"Did the Trial Court err when it found the existence of exceptional circumstances sufficient to overcome the presumption that it was in Claudia's best interest to be in the custody of the appellant, a biological parent?"

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

The trial in this case was held on October 1 and October 14, 2004. The witnesses were Karen; Karen's mother; Christopher; Christopher's mother; Jennifer N., whose child socializes with Sebastian; and Rebecca R., Christopher's fiancée. Relevant documents, including school and pre-school records for the children, were introduced into evidence.

Our recitation of the facts is based on the findings made by the trial court, and, when express findings were not made, a construction of the evidence most favorable to the court's decision.

---

1. This Court, on its motion, has elected to use the initials of the last names of the parties and their children, instead of their full last names, out of concern for the children's privacy. The caption of the case has been changed in this Court to reflect that decision. For the same reason, we also have used initials rather than full last names of witnesses.

At the time of trial, Karen was 43 years old. She was living in Avalon, New Jersey, where she had moved on May 26, 2004. For almost all of the 12 years before the move, she and Christopher had lived together in Catonsville. For the six years before Karen moved to Avalon, she had worked as a waitress at an upscale restaurant in Howard County. In 2003, she earned $33,000 from that work.

Karen has been married twice in her life. From those marriages, she had two children, one by each husband. At the time of the trial, those children were ages 22 and 19.

Christopher was 35 years old when the trial took place. He was living in Catonsville with Rebecca and her child. Christopher has never been married. He is employed by a loan consolidation company, at an annual salary of $35,000.

Karen and Christopher had a long and increasingly tumultuous domestic relationship. They met and became romantically involved in 1992. That same year, they moved into a single household, with Karen's two children from her marriages (who then were approximately ages 10 and 7).

On March 20, 1996, Sebastian was born. The parties' relationship started to deteriorate after that, and the parties constantly bickered and argued. Karen thought Christopher was self-absorbed and did not produce enough income for the family. Christopher thought Karen was unduly critical and demanding.

The parties experienced such discord that in early 1999 they separated for several months. Christopher left the family home and went to live with his parents. He continued to visit with Sebastian during the separation. The parties decided to attempt a reconciliation, and Christopher moved back into the family home.

On December 4, 1999, Claudia was born.

According to Karen, early in her pregnancy with Claudia, she read a sonogram report that gave the date of conception as March 13, 1999. When she saw that date, she realized immediately that Christopher was not the biological father of

the baby she was carrying. She knew that another man, with whom she had had sexual relations during the parties' separation, was the baby's biological father. That other man, who did not know about the pregnancy, wanted to continue the romantic relationship. In what she described as a decision favoring the welfare of her family, Karen "blew [the biological father] off," figuring that "half a man was better than none."

During the pregnancy, Karen acted as if Christopher were the baby's father, and did not tell him otherwise. She did not let the biological father know she was having a child. It appears that he never learned that she was pregnant and that they had no contact after their sexual relationship in early 1999.

Christopher did not know that Karen had been sexually involved with another man during their separation. For that reason, and because Karen acted as if Christopher were the father, Christopher assumed he was the baby's biological father. He was present at Claudia's birth, as he had been at Sebastian's birth, and chose her name, as he had chosen Sebastian's name. At the moment of Claudia's birth, Christopher had a fleeting thought that he might not be her father, because she did not look anything like him. He put that thought out of his mind, however, and assumed from then on that he was Claudia's biological father.

Within 24 hours of Claudia's birth, Karen signed an affidavit of parentage, identifying Christopher as Claudia's father. Karen also named Christopher as Claudia's father on her birth certificate.

Karen, Christopher, Sebastian, and Claudia (and at times Karen's other children) lived together and functioned as a family. Christopher thought he was Claudia's biological father and treated her as such. Karen acted as if Christopher were Claudia's biological father, despite her knowledge to the contrary, and did not disclose to anyone that he was not. To Claudia, Christopher is her father, and she has never known any other father. Christopher and Claudia bonded as father and child, and Claudia and Sebastian bonded as siblings. The

parties participated equally in child rearing. Karen's mother also helped out with the children. Christopher's parents and brother were active in the children's lives, although they were not as involved as Karen's mother was.

Eventually, the relationship between Karen and Christopher spiraled downward, becoming (in both of their words) "toxic" for everyone in the family. As Christopher put it, Karen was "prone to endless lecturing that would start whenever she felt like it needed to start. It would go on until she was exhausted . . . sometimes it would go for two or three hours at a time, [a]nd I would sit there in a chair and listen to her." Karen would curse, call him names, complain that he was a poor provider and an "Adult Child of Alcoholics" who was in denial about that situation, and that he was a bad father and a poor example to his children. Eventually he withdrew, avoiding Karen and "stay[ing] out of her way completely." He "was no longer interested in hearing her opinions of [him]."

For two months in the summer of 2003, the parties again separated, and Christopher left the family home. He visited the children during the separation.

On September 1, 2003, at Karen's suggestion (which Christopher took as a gesture of reconciliation), Christopher moved back into the family home. The next day, in the Circuit Court for Baltimore County, Karen filed a complaint for custody of Sebastian and Claudia. She alleged that she and Christopher were the children's parents and asked the court to award custody to her.

The parties continued to live in the same house, which became something of a battleground. On February 23, 2004, Christopher filed a countercomplaint seeking custody of the children.

Sometime in late April, Christopher became romantically involved with Rebecca, whom he met through his activities as cub scout den leader for Sebastian's troop. Rebecca's son is Sebastian's best friend and belongs to the same troop.

On April 29, 2004, Christopher's 35th birthday, the parties got into a heated argument. Karen taunted Christopher, suggesting that she knew something that made her certain she would prevail in the custody case. When Christopher pressed her about what made her so sure of her position, she responded that Claudia was not his biological child. To Karen's thinking, for that reason, a court deciding the case would grant her custody of Claudia and also of Sebastian, in order to keep the children together.

On May 25, 2004, while Christopher was at work, Karen brought a moving van to the family home and removed most of the furniture and household items. That same day, she and the children moved to Avalon. For some time prior to the move, Karen had told Christopher she intended to move to New Jersey. However, she did not tell Christopher the date of the move or that it was about to occur. She also did not tell him that she intended to move the children to New Jersey as well.

Christopher found out that Karen in fact was moving when a neighbor called and told him that a moving van was in front of the house and that furniture was being moved out of it. He went home and confronted Karen. She would not tell him where she was moving or disclose the whereabouts of the children. Christopher went to Sebastian's school and discovered that Karen already had withdrawn him, even though the school year was not finished. Claudia already had been taken out of her daycare.

Karen did not give the children any advance word of the move. They learned about it when it happened.

As Karen readily conceded at trial, she did not move to Avalon for any particular reason, other than she thought it was a nice small town that had a healthy tax base and therefore provided ample amenities to its citizens. Karen did not move because of work. She quit her waitressing job in Howard County voluntarily and did not have a job or any job prospects lined up in Avalon. For three months after the move (during the entire summer of 2004), Karen did not look

for work as a waitress. She did some part-time gardening work and lived on money she had saved.

Karen did not have any family connections in Avalon. Her children from her prior marriages did not live there. Her adult daughter was living in Catonsville and her adult son, who was married, was living in Florida. Karen's mother lived in Baltimore. (After the move, Karen's mother spent several days a week in Avalon, driving back and forth from Baltimore, apparently to help Karen.)

For a week after the move, Christopher could not contact the children. On June 1, 2004, Karen called and let him speak to the children. For the next three months, however, Karen would not disclose her location, the children's location, or anything about their whereabouts other than that they were somewhere in New Jersey. Karen's mother would not give Karen's address or telephone number to Christopher. During that time, Christopher's only contact with the children was by cellular phone. Karen monitored the telephone calls and had specific rules about what the children could and could not discuss with Christopher. She told Christopher that she would cut off the telephone calls if he questioned the children about where they were living. Karen offered to bring the children to Baltimore for visitation, but only if she supervised it. Christopher refused those offers.

On July 8, 2004, Karen filed a request for DNA testing to determine Claudia's paternity. The court granted the testing request. Thereafter, Karen took Claudia to Baltimore to have her blood drawn. She told Claudia, who was four years old, that the blood work was part of a routine doctor's visit.

In late July, Christopher received in the mail an invitation to a play in which Sebastian was to be performing. The invitation bore an Avalon, New Jersey, postmark. Later during the summer, one of Sebastian's friends from Catonsville went to visit him in New Jersey. Christopher got a "rough idea" from that boy of where Karen and the children were living in Avalon. He drove there, with Rebecca, and saw a house with toys outside that he recognized as belonging to

the children. There was no one home at the time, however. Christopher drove back to Catonsville without seeing the children.

Thereafter, Christopher told Karen that he knew where she and the children were living. At that point, which was about a month before the trial, Karen invited Christopher to visit the children in Avalon, but under her supervision. Also, about 90 days after the move, Christopher visited the children at Karen's daughter's house in Catonsville. That visit also was closely supervised by Karen and her two adult children.

On September 4, 2004, Karen took a job as a waitress at a restaurant in Avalon.

On September 29, 2004, two days before trial, the DNA testing results were completed. They showed that Christopher "c[ould] be excluded as the father" of Claudia, and they were admitted as the court's exhibit at the beginning of the trial. As of the time of trial, Claudia had not been told that Christopher is not her biological father, nor had Sebastian been given that information. The information had been revealed to Karen's mother and Christopher's parents.[2]

At trial, Karen was asked to identify Claudia's biological father. She refused to do so.

Sebastian finished the 2003–2004 school year at Avalon Elementary School, and was in third grade at that school when the trial took place. School records and testimony of the parties showed that he was doing well in that school, and that he also had been doing well in Westowne Elementary School, in Catonsville, which is the school he attended before the move and would attend if he were living with Christopher. Claudia was enrolled in a Christian preschool in Avalon. She had been enrolled in a church day care center in Catonsville, which she would again attend if she were living with Christopher.

---

**2.** When this case was argued before this Court, on June 10, 2005, the panel inquired whether Sebastian or Claudia yet had been told that Christopher is not Claudia's biological father and was told they had not.

Karen signed a long-term lease on the house she and the children moved into on May 26. The house has three bedrooms and plenty of room for the children. The house Christopher lives in with Rebecca and her child has four bedrooms.[3]

At the conclusion of the evidence, and after hearing argument of counsel, the court made findings and rendered a decision. The court found that Karen is a fit parent. It further found that there were exceptional circumstances that rebutted the presumption that it would be in Claudia's best interest to be in the custody of Karen, her only identified biological parent.

The court explained its exceptional circumstances finding as follows:

> Claudia, the testimony has revealed, is not the natural child of ... [Christopher]. It's [Karen's] argument that that kicks him out of the ballpark because in order, according to counsel for [Karen], in order for him to come into consideration at all, the testimony has to be that either [Karen] is not fit or there were exceptional circumstances.... Most of the cases, frankly, deal with grandparents or foster parents. And really, this is an unusual case. There's really no case on point where you're dealing with a father of the child who all along thought he was the father, acted as this child's father, was ... on affidavits of paternity and was held out to the community and to this child and to [Karen] as this child's father....
>
> As a technical matter, [Christopher] is, in fact, not the biological father because of DNA testing that was done. The Court is disturbed that the only time the issue of paternity came up and the request to this Court for DNA testing was when [Karen] was seeking sole custody of this child. And it's this Court's opinion that she was using that as a leg up to establish the higher standard, or an uneven standard to shift the burden to [Christopher] in order to

---

**3.** The house the parties had lived in together was sold. Apparently, it had been titled in both of their names. They shared in the profit on the sale.

give her a leg up in the custody of Claudia, then believing that the Court would not want to split two children up.

So that being said, I'm going to look at this case both ways: First, going through whether or not I believe that [Christopher] has met any of the exceptional circumstances, and then, secondly, to go through the physical [custody] factors.

First off, in terms of the cases that deal with a parent and a nonparent ... I do find for the record both under the general physical custody factors, under the best interests standard, that both parents are fit parents and are capable parents. Both parents clearly love their children, and I find that they're both fit in terms of one of the factors that this Court must consider in the best interests. So that being said, in looking at [Christopher] as the nonbiological parent, then the next question is are there any exceptional circumstances that have been proven to this Court that would then warrant the Court to ... look at the best interests. 'Cause in reviewing the third party cases, before I can get to the best interest standard, this Court has to find that there are exceptional circumstances ... elevating [Christopher] to a more equal footing with [Karen].

This Court has looked at the following factors in determining whether there [are] exceptional circumstances. First I looked at the nature and strength of the ties between the child and the third party, which would be [Christopher]. There are clearly very strong ties between them under the caselaw and under ... the facts of this case clearly, he acted as this child's father, thought he was this child's father, was listed on an affidavit of paternity as this child's father and clearly acted in the role of this child's father. And all the testimony's been that they have a good relationship; they have a good bond, that Claudia loves her father. So there's that factor which weighs on the side of [Christopher] in terms of the exceptional circumstances.

I also find that he clearly has a very intense and genuine desire to have this child, in spite of the fact that it is not his biologic [sic] child. He could have come into this Court and

said it's not my child, I'm not interested in custody, I just was [sic] Sebastian and then I don't have to pay child support. That's clearly not his motive. So although there's been testimony that there's been, there is clearly a strong bond for Claudia with [Karen], I believe that is true with [Christopher], and I think he is genuine in his desire to have custody of this child.

I've looked into the stability and certainty of the child's future, and the custody of the parent and whether or not that weighs in, and I feel that that does weigh in. I think [Karen] has shown a pattern of immaturity and has looked out for what appears to be her own best interests, which she even admitted to in testimony, that in looking at her relationships in the past, that in many cases she's put her interests over the children. And, frankly, this Court finds that in this particular case, by abruptly moving the children to New Jersey, I think she put her best interests over the children and has not created a stable and certain environment for them in New Jersey.

I have looked at the—let me just go through. I had, this Court has considered the emotional effect on changing custody. Both parties have really had custody of the child—up until May 25th or 26, when [Karen] abruptly removed the children unilaterally for what this Court considers to be her best interests, not in the children's best interests. The fact that Avalon is a nice small town, safe community with good schools, is not sufficient, in the best interests of the children.... [T]his Court does find for the record that there are exceptional factors in this case.... [T]here are exceptional circumstances based on [Christopher's] relationship with Claudia, his care of Claudia, the fact that he's been the father, and the only time that his paternity was ever challenged was when this Court finds [Karen] was getting a leg up on trying to seek sole custody in this case....

The court then addressed what custody determination would be in the children's best interests. It considered the fitness of the parties; their characters and reputations; the desire of

the parents and any agreements between them; the potential for maintaining natural family relations; the material opportunities affecting the children's future lives; the age, health, and gender of the children; the residences of the parties and potential for visitation; and the length of the separation of the parties. The court found that Karen had acted selfishly, placing her interests above those of the children, treating Christopher's role in their lives as unimportant, and attempting to alienate the children from him. The court concluded that it would be in the children's best interests for custody to be in Christopher, with visitation for Karen.

The court memorialized its decision in a written order.[4]

When necessary, we will add factual detail in our discussion.

## DISCUSSION

### (a)

■■■■ Appellate review of a trial court's decision in a child custody case is governed by Maryland Rule 8–131(c), which pertains to the review of actions tried without a jury. *Davis v. Davis*, 280 Md. 119, 122, 372 A.2d 231 (1977) (discussing Maryland Rules 886 and 1086, the predecessors to Maryland Rule 8–131(c)). We review the case on both the law and the evidence: we will not set aside the judgment of the trial court unless it is clearly erroneous, and we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* In summary, when we scrutinize factual findings, we apply the clearly erroneous standard; when we review issues of law, we do so *de novo;* and, finally, we disturb the trial court's ultimate conclusion on the question of custody "only if there has been a clear abuse of discretion." *Id.* at 125–26, 372 A.2d 231.

---

4. So that the children's living situation would not be changed abruptly, in the middle of the school semester, the court granted temporary custody to Karen, until the winter holiday break, and final custody to Christopher thereafter, with increased visitation during the transfer period, to make the change gradual.

 In the area of child custody, the law recognizes a rebuttable presumption that the child's best interests will best be served by custody in a biological parent, over a third party; and a third party bears the burden of showing the contrary. *Ross v. Hoffman,* 280 Md. 172, 178, 372 A.2d 582 (1977). The presumption arises from the judicially accepted belief that "the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to a desire and efforts to care properly for and raise the child, which are greater than another would be likely to display." *Melton v. Connolly,* 219 Md. 184, 188, 148 A.2d 387 (1959).

 In a disputed custody case between a private third party and the biological parents of a child, the presumption in favor of custody in the biological parents can be rebutted by a finding either of lack of fitness on their part or the existence of "extraordinary circumstances ... which are significantly detrimental to the child remaining in the custody of the [biological] parent or parents." *McDermott v. Dougherty,* 385 Md. 320, 325, 869 A.2d 751 (2005). If the court makes neither such finding, the presumption remains, and custody must be awarded to the biological parents (or parent). If the court makes either such finding (parental unfitness or exceptional circumstances), the presumption is rebutted and the court then must resolve the custody dispute by applying the best interest of the child standard. *Id.*

*See also Shurupoff v. Vockroth,* 372 Md. 639, 661, 814 A.2d 543 (2003) (holding that, in custody dispute between a natural parent and a third party, it is presumed that the child's best interest lies with parental custody; presumption can be rebutted by showing unfitness or that extraordinary circumstances exist that would make parental custody detrimental to the child's best interest); *Sider v. Sider,* 334 Md. 512, 531, 639 A.2d 1076 (1994) (holding that, "[w]hen the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are

such exceptional circumstances as [to] make such custody detrimental to the best interest of the child"); *Hoffman, supra,* 280 Md. at 178–79, 372 A.2d 582 (same).

■ The circumstances that will rebut the presumption that a child's best interests are served by being in the custody of his biological parent, as opposed to in the custody of a private third party, must be "extraordinary, exceptional, or compelling . . . [such as] that require the court to remove the child from the natural parent[ ] in order to protect the child from harm." *McDermott, supra,* 385 Md. at 357, 869 A.2d 751.

Although the parental unfitness/exceptional circumstances test was recognized before the Court of Appeals decided *Hoffman, see Melton, supra,* 219 Md. at 188–89, 148 A.2d 387; *Trenton v. Christ,* 216 Md. 418, 420, 140 A.2d 660 (1958); *Ross v. Pick,* 199 Md. 341, 351–52, 86 A.2d 463 (1952), the *Hoffman* Court reviewed and synthesized the factors that may be relevant to the decision whether parental custody will be detrimental to a child's best interest, and described them:

> The factors which emerge from our prior decisions which may be of probative value in determining the existence of exceptional circumstances include the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, [and] the stability and certainty as to the child's future in the custody of the parent.

280 Md. at 191, 372 A.2d 582. The Court affirmed a finding of exceptional circumstances when the child had been in the continuous custody of the third-party couple from age four months, until she was nine years old; the biological mother did nothing to gain custody for eight years; the biological mother's motives in seeking custody were questionable; and

the child would suffer psychological trauma upon removal from people she always had known to be her parents.

 In *Sider, supra,* the Court repeated and expanded the non-exhaustive list of factors:

(1) the length of time the child has been away from the biological parent;

(2) the age of the child when care was assumed by a third party;

(3) the possible emotional effect on the child of a change of custody;

(4) the period of time which elapsed before the parent sought to reclaim the child;

(5) the nature and strength of the ties between the child and the third party custodian;

(6) the intensity and genuineness of the parent's desire to have the child;

(7) the stability and certainty as to the child's future in the custody of the parent.

334 Md. at 532, 639 A.2d 1076. The Court stated that other important factors can be "the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs.... " *Id.* (quoting *Turner v. Whisted,* 327 Md. 106, 116–17, 607 A.2d 935 (1992)). Additionally, the Court noted that the child's relationship with the third party that results in bonding and psychological dependence may also be important. *Id.* at 533, 639 A.2d 1076 (citing *Monroe v. Monroe,* 329 Md. 758, 775–76, 621 A.2d 898 (1993)). The Court further noted that "it is ordinarily in the best interest of a child to be raised with his or her siblings." *Id.; see also Hild v. Hild,* 221 Md. 349, 359, 157 A.2d 442 (1960); *Melton, supra,* 219 Md. at 190, 148 A.2d 387; *Hadick v. Hadick,* 90 Md.App. 740, 748, 603 A.2d 915 (1992).

**(b)**

Because Claudia is not Christopher's biological child, the custody dispute over her is between her only known biological

parent, Karen, and a third party, Christopher. The trial court found that Karen is a fit parent. It granted custody of Claudia to Christopher, a third party, upon a finding of exceptional circumstances that would make it detrimental for Claudia to be in Karen's custody.

Karen contends the finding of exceptional circumstances was clearly erroneous and the court's decision to grant custody of Claudia to Christopher was an abuse of discretion. First, she argues that the strength of the tie between Claudia and Christopher was "just not enough to overcome the presumption," because the evidence likewise showed that a strong parent/child bond existed between Claudia and Karen. She relies on *Lipiano v. Lipiano,* 89 Md.App. 571, 598 A.2d 854 (1991), and *Tedesco v. Tedesco,* 111 Md.App. 648, 683 A.2d 1133 (1996), in this regard. She also argues that the court's finding of exceptional circumstances was, in reality, based solely on the bond between Claudia and Christopher, and that that bond alone is not enough to show exceptional circumstances under the proper standard in Maryland law.

Second, Karen argues that the trial court wrongly considered as a factor in its exceptional circumstances finding Christopher's intense and genuine desire to have custody of Claudia. Citing *Hoffman, supra,* she argues that, while the *natural parent's* desire to have custody is a proper factor to consider in deciding whether exceptional circumstances exist, the *third party's* desire to have custody is not a proper factor.

Karen argues, thirdly, that the trial court ignored evidence favorable to her in finding that she had not created a stable and certain environment for the children in Avalon. Finally, she argues that the trial court's finding about the emotional impact upon Claudia in changing custody was improper, because it was grounded on a finding that Claudia had been in the custody of both parties for most of her life. In fact, "[Karen] was the only person who could have truly had custody as the biological parent."

Christopher responds that the evidence was sufficient to support a finding of exceptional circumstances and the court

did not abuse its discretion in awarding custody to him. He relies primarily on *Monroe, supra.*

### (c)

A review of the three cases relied upon by the parties, and of *Sider, supra,* is helpful to our analysis. These are the only reported Maryland custody cases in which the child, from the time of birth or infancy, grew up in a family unit with the biological mother and the third party occupying the role of father.

In *Lipiano, supra,* during the parties' marriage, the wife had an affair with another man, and gave birth to his child. It was disputed as to whether she told her husband that he was not the child's father. The wife named the husband as the baby's father on the birth certificate and ended the affair. She and the husband and child lived together as a family for four years. The wife then resumed the affair and left the husband, taking the child with her. The wife, the paramour, and the child took up residence as a family. The husband filed for divorce and sought custody of the child. Blood testing showed that the paramour was the child's biological father. The wife and the paramour planned to marry when the divorce was final.

The trial court ruled that the husband was a third party; that the biological parents (the wife and the paramour) were fit; and that there were no exceptional circumstances sufficient to overcome the presumption of custody in favor of the biological parents. On that basis, it granted custody to the wife.

This Court affirmed the decision on appeal. We explained that findings of fitness and exceptional circumstances *vel non* are reviewed for clear error and exercises of judgment based on non-clearly erroneous factual findings are reviewed for abuse of discretion. 89 Md.App. at 576, 598 A.2d 854. We concluded that there were facts in the record to justify the trial court's findings on both issues, and therefore they were not clearly erroneous; and that the court had not abused its

discretion in exercising its judgment to grant custody to the wife and paramour.

We commented that, while the wife's conduct could not be condoned, it did not make her an unfit parent, nor did the paramour's delay in putting forth his claim make him unfit.

> [The child] is with her natural parents, in the commonly accepted notion of that term—parents whom the record indicates care very much for her and are able to provide her a stable and nurturing environment—and yet she retains the prospect of a loving relationship with [her mother's former husband] as well. This was no doubt an agonizing decision for the trial judge. Other judges may have decided the case differently. But we can find no basis to upset that decision.

*Id.* at 578, 598 A.2d 854.

In *Tedesco, supra,* we likewise affirmed a trial court's decision to grant custody to a biological parent, in a dispute with the child's stepfather. The stepfather and the mother met not long after she gave birth to her daughter. The daughter's biological father had been killed in an accident before she was born. The stepfather and mother married when the daughter was a little over one year old. Within a year of their marriage, they had a son who was the biological child of both of them. Approximately six months after the son's birth, they separated. The daughter was not yet three years old.

The trial court granted custody of both children to the mother. On appeal, the husband argued that, because he had been the daughter's stepfather virtually her entire life, and the only father figure she had known, he should be considered to have the same status as a biological parent in the custody dispute. This Court rejected the argument, stating that any person seeking custody of a child who is not the child's biological parent is in the eyes of the law a third party, and does not enjoy the presumption in favor of custody. 111 Md.App. at 659, 683 A.2d 1133. We observed:

This does not mean, however, that a natural parent will always be awarded custody of a child over a third party, and past cases have proven that third parties have, in fact, been granted custody when circumstances warranted such awards. *See, e.g., Pick* [*supra* ], 199 Md. at 351–52 [86 A.2d 463] (Court of Appeals reversed award of custody to natural mother of eleven-year-old who had resided with third party for ten years after mother abandoned child); *Dietrich* [*v. Anderson* ], 185 Md. [103, 121, 43 A.2d 186] (1945) (custody to foster parents upheld upon father's concession of his inability to raise and care for child at time of his or her birth and left child in care of foster couple for five years); *Boothe v. Boothe,* 56 Md.App. 1, 6–7, 466 A.2d 58 (1983) (grandparents awarded custody over natural mother when custodial father was killed).

*Id.* We refused to disturb the trial court's decision that it was not persuaded that the facts presented by the stepfather overcame the presumption in favor of custody in the biological parent.

In *Monroe, supra,* the mother became pregnant when she and the father were dating. The father was present when the child was born and his name was put on the child's birth certificate. The mother and father lived together and married when the child was 2½ years old. A few months later, during an argument, the mother told the father he was not the child's biological father. The parties separated, and divorce and custody proceedings ensued. The paternity of the child was not raised as an issue, and the case was resolved by settlement, adopted in a court order, which gave custody to the mother. Later, the father filed an emergency motion to enforce the custody order, arguing that the mother had violated one of its conditions.

The mother responded by challenging paternity and filing a motion for blood tests. The results of the tests excluded the father as the biological father of the child. A hearing was held before a master, who recommended custody in favor of the nonbiological father, upon a finding of exceptional circumstances. Exceptions were taken and sustained by the trial

court, which disagreed with the master's finding of exceptional circumstances. The trial court ruled that, in the cases in which exceptional circumstances had been found, the child had been separated from his or her biological parents for long periods of time, constituting almost all of the child's life, and would have been uprooted from a stable environment if custody was given to the biological parent. The trial court concluded that those factors did not exist in the case before it.

The case ultimately was decided by the Court of Appeals, which vacated the custody determination and held that blood tests were not warranted to resolve the custody dispute. The Court went on to observe that, even though the blood tests were admitted into evidence, the fit parent/exceptional circumstances standard still applied. Furthermore, the trial court's assessment of what could constitute exceptional circumstances had been unduly narrow:

> The cases relied on by the trial court do not exhaustively or finally define the universe of circumstances sufficiently exceptional as to warrant resolving a custody dispute against a biological parent and in favor of a third party. Whether the child has established a relationship with the third party sufficient to constitute exceptional circumstances, rebutting the presumption of custody in the biological parent, is not dependent on its development during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without a biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent.

329 Md. at 775, 621 A.2d 898. *Cf. S.F. v. M.D.*, 132 Md.App. 99, 111, 751 A.2d 9 (2000) (holding that fit parent/exceptional circumstances test did not apply in visitation dispute between biological mother and mother's former lesbian partner but that psychological parent/child bond between partner and child could be considered in deciding visitation).

The *Monroe* Court concluded that there was ample evidence that could have supported a factual finding of exceptional circumstances. It remanded the case for a new hearing on the custody issue.

Finally, in *Sider, supra,* for a three-week period in 1989, the wife had an affair with a man named Gus. She became pregnant and gave birth to a son. She did not tell Gus about the pregnancy and he did not know about the child. The husband assumed the child was his and had no reason to think otherwise; the wife acted as if the husband was the child's biological father. When the child was 21 months old, the wife left the home and took the child with her. She moved in with another man named George. She later married George and they had a child together. The husband brought an action for divorce in which he sought custody of the child.

At the wife's suggestion, George approached Gus, told him about the situation, and further disclosed that the wife thought Gus was her son's biological father. George asked Gus to take a blood test, which he did. The test results established that Gus indeed was the child's biological father. The wife and Gus brought a paternity action, seeking to have Gus declared the child's father. In the meantime, in the custody case, the court ruled that, given that the wife led the husband to believe that he was the child's father, and that they had lived together as a family for 21 months, she was estopped to deny that he was the child's father; and for purposes of deciding custody, he would be considered to be the child's biological parent. The court denied the paternity request and granted custody to the husband. The court further ruled that, even if the husband was a third party for custody purposes, there were exceptional circumstances that warranted awarding him custody.

The case eventually was decided by the Court of Appeals, which vacated the custody award, holding that the trial court was legally incorrect in ruling that the doctrine of estoppel applied. The Court further held that the alternative basis for the court's decision, that there were exceptional circum-

stances, was stated only in conclusory fashion, without reasons, and was an abuse of discretion because it was made without any consideration of the child's biological father, Gus. The Court remanded the case for the court to decide anew the issue of custody.

**(d)**

 The trial court's finding of exceptional circumstances in this case was not clearly erroneous or the product of an abusive exercise of judgment.

 As noted above, Karen complains that, in deciding the issue of exceptional circumstances, the trial court should have discounted entirely the psychological father/daughter relationship between Claudia and Christopher because Claudia also had a strong mother/daughter relationship with her. This argument is directly contrary to the observation of the Court of Appeals in *Monroe, supra,* that a child can develop a strong relationship of parental bonding and psychological dependence with a third party at the same time that the child is in an ongoing parent/child relationship with his biological parent, and that the scenarios constituting exceptional circumstances are not confined to those in which the biological parents have been absent from the child's life for a period of time.

Indeed, in all four of the cases we have discussed in detail above, the third party occupied the role of a parent toward the child, and a parent/child bond developed between the third party and the child, while they both lived with the biological mother as a family unit. In *Lipiano, supra,* Judge Wilner, writing for this Court, explained that the existence of such a bond is significant because of the potential for emotional harm to the child if the bond is disrupted: "[T]he closeness of the relationship between the child and the nonbiological parent is of considerable importance, *[and] that importance relates to whether there are exceptional circumstances which would make an award of custody to the biological parent detrimental to the best interest of the child.*" 89 Md.App. at 577, 598 A.2d 854. (Emphasis added.)

The trial court in the case at bar did not, as Karen argues, find exceptional circumstances based only on the mere existence of a strong parental bond between Christopher and Claudia. What comes through as being important to the trial court, in deciding the exceptional circumstances issue, is not only that Claudia and Christopher had bonded in a father/daughter relationship but also that Karen had so little respect for that bond and so little concern about its meaning to Claudia, that she was willing to use her authority as the biological parent to disrupt the relationship—no matter how detrimental that could be to Claudia.

As the trial court pointed out, Karen's conduct was designed to advantage herself, without regard for the emotional impact on Claudia. After creating all the circumstances that would make Christopher, Claudia, and Sebastian think that Christopher was Claudia's father, Karen challenged Claudia's paternity solely to make the custody case—which she at first represented to the court as being between biological parents—a contest between a biological parent and a third party. She then abruptly moved the children away from Maryland, making it almost impossible for Christopher to communicate with them. She also did not allow the children to see Christopher, except infrequently and with restrictions, including that visitation had to be in her presence. Finally, after disestablishing Claudia's paternity, Karen refused to identify Claudia's biological father, and thus effectively refused to open the door to Claudia's developing a relationship with him.

By her behavior, which the trial judge found to be selfish, a "pattern of immaturity," and designed to elevate her own personal interests above Claudia's well being, Karen made clear that, rather than cooperate with Christopher to continue the father/daughter relationship he and Claudia had formed, she would rather have Claudia rendered fatherless. The bond between Christopher and Claudia, and Karen's actions in disregard of the importance of the bond to Claudia's emotional health, were pertinent to the issue of exceptional circumstances that would make custody in Karen detrimental to

Claudia, and as such were properly considered by the trial court.

There also is no merit to Karen's argument that Christopher's "intense and genuine desire" to have custody of Claudia should not have been taken into consideration by the trial court in making its exceptional circumstances finding. Karen complains that that factor is not enumerated in *Hoffman*. The factors set forth in *Hoffman, supra*, as reiterated and expanded in *Sider, supra*, are guiding but not exclusive, however. *Hoffman, supra*, 280 Md. at 191, 372 A.2d 582; *Sider, supra*, 334 Md. at 532, 639 A.2d 1076 (noting that circuit courts should consider the factors set forth as well as "any other relevant factors" in determining whether exceptional circumstances exist); *S.F., supra*, 132 Md.App. at 113, 751 A.2d 9 (noting that the list of factors in *Sider* was "non-exhaustive").

Here, the genuineness of Christopher's desire to have custody was relevant. The trial judge made plain that, in her view, Karen had not acted genuinely in pursuing custody of Claudia. She had placed her own interests above those of Claudia, both by interjecting the issue of paternity into the case, after telling the court at first that the dispute was between biological parents, and by later refusing to disclose the identity of Claudia's biological father. Whether Christopher was seeking custody of Claudia as a responsive litigation strategy, or because he genuinely wanted to have custody of Claudia (and if so, the intensity of his genuine desire for custody) was part of the complete picture in the case.

In her third argument, that the trial court committed clear error in disregarding evidence that she had created a stable home for Claudia in New Jersey, and incorrectly found to the contrary, Karen envisions stability as a one-dimensional factor. To be sure, the evidence showed that Avalon, New Jersey is a pleasant town, with good schools and facilities, and that the children were living in a nice home there and attended good schools. It also showed that Karen had no connection whatsoever to the Avalon community before she moved there with

the children and no reason to move out-of-state, other than to distance the children from Christopher. The evidence further showed that the children's living and school situations in Catonsville had been stable.

The trial judge's analysis of stability for Claudia was not confined to the material advantages, however, but took into account the certainty that she would maintain her family relationships in the future. It was in that context that the court found that, by abruptly moving the children to New Jersey, Karen had "put her best interests over [those of] the children and [did] not create[ ] a stable and certain environment for them in New Jersey." Karen herself testified that, in moving the children to New Jersey, she had given practically no thought to the effect the move would have on their relationship with Christopher (or with other relatives on his side of the family), and still did not think those relationships were important.

Karen's last argument is a quibble over semantics. She criticizes the trial judge for stating that, until Karen moved to New Jersey, both parties had had custody of the children, arguing that only she could have had custody of Claudia, because only she was Claudia's biological parent. Notwithstanding that Christopher was not Claudia's biological parent, Claudia was in Christopher's custody for virtually all of her life. Karen complains that Claudia has been in her physical custody for Claudia's entire life, and there had been at least two periods in the past in which she and Claudia did not live in the same house as Christopher-in the summer of 2003 and from May 26, 2004 forward. It is apparent that the trial judge was aware of these facts but did not find them compelling on the issue of exceptional circumstances, which was her prerogative.

██ Custody decisions almost always are difficult, and are wrenching in a case like this one. The trial judge was confronted with a four-year-old girl who had known but one man as her father, and who loves him; a nonbiological father who loves the girl he thought he was father to, who wants the

father/daughter relationship to continue, and who is willing to cooperate with the mother; and a mother who, while both the nurturing and biological mother of the girl, is not only unwilling to cooperate with the nonbiological father but had taken steps to alienate both children from him. Granting custody to Karen made it likely that Claudia would lose the only father she had known, and suffer the pain that such loss would entail. Granting custody to Christopher made it likely that Claudia would continue to have a mother and a father figure in her life, and would not suffer emotionally beyond that which a child ordinarily suffers when the family breaks up. The trial court's finding—that these were exceptional circumstances that would make granting custody of Claudia to Karen detrimental to Claudia—was not clearly erroneous, and its decision to grant custody of Claudia to Christopher was not an abuse of discretion.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**